STATE v. JAMES LEE PRIMES

No. 493

(Filed 21 January 1969)

**1. Criminal Law § 104— nonsuit — consideration of evidence**

On motion for compulsory nonsuit made at the close of all the evidence, the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable intendment thereon and every reasonable inference therefrom.

**2. Rape § 1— elements of the offense**

Rape is the carnal knowledge of a female person by force and against her will.

**3. Rape § 1— elements of the offense — force**

The force necessary to constitute rape need not be actual physical force; fear, fright or coercion may take the place of force.

**4. Rape § 1— elements of the offense — consent**

While consent by the female is a complete defense to the charge of rape, consent which is induced by fear of violence is void and is no legal consent.

**5. Criminal Law § 104— nonsuit — consideration of evidence**

In considering the motion for a compulsory nonsuit, the court is not concerned with the weight of the testimony, or with its truth or falsity, but only with the sufficiency to carry the case to the jury and to sustain the indictment.

**6. Rape § 5— sufficiency of evidence**

In this prosecution charging defendant with rape, the evidence is sufficient to be submitted to the jury on the question of defendant's guilt.

**7. Criminal Law § 66— evidence of lineup identification — corroborative evidence**

In a prosecution for rape, testimony of the prosecutrix that she identified the defendant in a police identification lineup is admissible to corroborate her other testimony that she had identified the defendant prior to the lineup, and there is no merit in defendant's contention that, since he admitted the intercourse and did not dispute his identity, the evidence of the lineup identification was prejudicial in tending to obscure his defense that the intercourse was at the insistence and with the consent of the prosecutrix.

APPEAL by defendant from *Bickett, J.,* 2 February 1968 Regular Criminal Session of WAKE.

Criminal prosecution on an indictment charging that James Lee Primes on 9 October 1967, with force and arms, did unlawfully, willfully, and feloniously ravish and carnally know Carolyn Wayne Daniels, a female, by force and against her will, a violation of G.S. 14-21.

The defendant, who was an indigent and was represented by his court-appointed counsel, Garland B. Daniel, entered a plea of not guilty. Verdict: The defendant, James Lee Primes, is guilty of rape with the recommendation that punishment be imprisonment for the term of his natural life. From a sentence of imprisonment for life in the State's Prison, defendant appeals.

*Attorney General T. W. Bruton and Staff Attorney Andrew A. Vanore, Jr., for the State.*

*Garland B. Daniel for defendant appellant.*

PARKER, C.J.

On appeal defendant was represented at the State's expense by his court-appointed counsel, Garland B. Daniel, a member of the Wake County Bar. The record in the case and the brief of defendant were mimeographed in the same manner as is done in the case of solvent defendants.

[1] Defendant assigns as error the denial of his motion for compulsory nonsuit made at the close of all the evidence. On such a motion the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable intendment thereon and every reasonable inference therefrom. 2 Strong's N. C. Index 2d Criminal Law § 104.

The State's evidence, considered in the light most favorable to it, tends to show the following material facts: On 9 October 1967 Carolyn Wayne Daniels, a young white woman, was employed at Eckerd's Drug Store in Raleigh. She and Robert Calvin Stephens had plans to be married and were married on 16 February 1968. At 5:30 p.m. on 9 October 1967 she got off work and proceeded to her automobile which was parked in a parking deck. On her way home down Salisbury Street in the city of Raleigh she had a flat tire at the corner of Lenoir and South Salisbury Streets. She pulled into a parking place and got out of her car to look at the flat tire. Defendant, a Negro, was walking along the street. He offered to place the spare tire on the car in place of the flat tire, and she accepted his offer. When he had placed the spare tire on the automobile, she got $2 out of her pocketbook and offered to pay him $2 for fixing her tire. At first he refused to accept the $2, and then upon her insistence accepted it. Defendant said that he had missed his ride with his brother-in-law to Garner, a town near Raleigh. She said, "Well I'm going out that way. I live out on 401 South and I can let you off right there where the ends meet." They got into her automobile and she drove off. In driving down the street they engaged in a conversation. He told her that he worked at the Carolina Power and Light Company as a linesman. He had on a yellow helmet like linesmen wear. When they got to the road where she was supposed to keep going straight, he told her to turn down Tryon Road, that his brother worked down that road and he could take him home. She turned off Highway 401 South onto Tryon Road. They came to a

filling station where she was supposed to turn left on Lake Wheeler Road to go to her boy friend's house to baby sit for his sister. He told her to go ahead down the road. She said, "I am supposed to go the other way," and he said, "It's just a little ways down this road." She was really getting scared and drove ahead. They proceeded a distance down the road and stopped at a dirt road. She told him he could get out and walk down the dirt road a little ways. He replied, "No, it's just a little ways down this road, go ahead and take me." She turned down this dirt road and saw a sign ahead reading "dead-end road." She said to him, "This is a dead-end road," and defendant said, "No, it's not. It's just a sign." He further said, "It's just a little ways down here." At the dead-end road there is a circle where one can circle around and come right back up the road. She turned around in that circle and started coming back up the road. Defendant clapped his hand over her mouth and she started struggling. He said, "Don't scream. If you do I'll kill you. Come on and get out." She replied, "No, please leave me alone, please leave me alone. If it's my car you want you can have it. If it's money you want you can have that. Just anything just please leave me alone." He replied, "I'm not gonna hurt you. I just want to look at you." He started pulling her out of the side of her automobile, so she got out and he started pulling her into the woods. She started crying and begging him to leave her alone. He kept pulling her. He said, "I'm not gonna hurt you, I'm not gonna hurt you, I just want to look at you." She replied, "Please don't do anything to me, please don't. I haven't ever been touched before. Please don't mess with me. Just please leave me alone. I'm planning on getting married soon, please don't mess with me." He kept saying, "I'm not gonna hurt you. I just want to look at you." He told her to pull her pants down, and she told him, "No." Defendant said, "I said pull them down, or I'll kill you." So she pulled up her dress and started pulling her pants down and could not get them down. He took his hands and jerked them and pulled them down just as fast as he could, and he told her to lie down on the ground. She told him that she was not. He said, "You'll do what I say. I'll kill you. I'll shoot you." She said, "Please don't. Please leave me alone." He got on top of her on the ground, unzipped his pants and had intercourse with her. He had his arms on her arms, and they were pinned back on the ground. She was crying. Miss Daniels testified that she "did not at any time consent or agree to have intercourse" with the defendant. She testified that she was afraid that if she did not submit to the defendant's demands he would kill .her. She testified, "I really thought he was gonna shoot me, because I have heard so many cases that have come up like that, where

people get raped and they killed them and leave them. That's what I was scared of. I just thought if I could live and get out of there that everything would be all right." He heard a car coming. He got up and said, "Get up, get up." She got up and was trying to pull her pants up and said, "I can't get them up." He started coming at her and she jerked them up any way she could. He said, "Come on, come on." She could hardly walk. He took her by her arm and dragged her out of the woods. She never saw an automobile, but she heard one. He told her to take him to the end of the road at Dix Hill. She took him there and when she let him out, defendant said that he was married and had a baby and asked her not to tell anybody about it. She let him out at the road at Dix Hill. When he got out she went straight to her fiance's house. When she got there, her fiance, Robert Calvin Stephens, was washing his automobile. She could not get out of the automobile and could not move. She opened the automobile door and started screaming for Robert to come to her. She told him what had happened. She was hurting so she could not move. It hurt her when she was penetrated because she had never been touched before and was a virgin. Her fiance got a neighbor to call the sheriff's department and carry her to a local hospital. At the hospital she talked with the sheriff's deputies and with Dr. Clifford C. Byrum.

Dr. Byrum examined her in the hospital. Her clothes were ruffled and she had beggar lice over her clothing and quite a bit of dirt on her legs. She was quite upset emotionally. He made a general examination and pelvic examination. He swabbed her entire vagina for smears. From the smears he found sperms. She told Dr. Byrum that she had been raped by a Negro.

About 8 p.m. on 9 October 1967 Richard Branch, a deputy sheriff with the Wake County Sheriff's Department, saw Carolyn Wayne Daniels at Wake Memorial Hospital. She was there with her present husband. He talked with Carolyn. She told him what had occurred, which is substantially what we have related above. When he saw her at the hospital, she was in a highly nervous condition. The next day he had Carolyn Daniels and her fiance meet him at the sheriff's office at approximately 5 p.m. He took an unmarked car and went back to the parking lot where Carolyn saw the defendant the previous evening. They arrived there about 5:10 and sat there until about 5:45 observing Negroes with construction helmets. About 5:45 p.m. Carolyn stated to him, "That's the man right there, getting out of the back of that pickup truck." The man she identified was the defendant. Defendant got out of the pickup truck on Lenoir

Street and walked east on Lenoir Street towards Fayetteville Street. The officer asked Carolyn and her fiance to get out of his automobile and go to the Sheriff's Department and wait for him, and then he pulled his automobile in behind defendant at the Shell station on Fayetteville Street and asked him to come to his car. He asked defendant for his identification, at which time he took out of his wallet a selective service card with the name "James Lee Primes" on it. He told Primes that he was a deputy sheriff and that he was running an investigation on a crime, that he was not under arrest, and wanted to know if he would go of his own free will with him to a magistrate's office and let him talk to him, and defendant stated that he did not mind. Primes had on a yellow helmet at that time. He rode with him to the magistrate's office. Carolyn Daniels came there later. They had a lineup at the jail, with the consent of James Lee Primes. There were seven men in the lineup — all Negroes. In the lineup she identified Primes as the man who had assaulted her.

W. E. Weathersbee is a member of the City-County Bureau of Identification. He has been employed there for two years and his duties are to gather evidence, fingerprints, take pictures, and other things. About 8 p.m. on 9 October 1967 he was called to Wake Memorial Hospital where he met Deputy Sheriffs Howell and Branch. Carolyn Wayne Daniels was there. He went back into the emergency room in the hospital and saw her lying on the table. Beggar lice were in her hose. After observing her, he followed her fiance to where Miss Daniels' car was parked near a trailer. He dusted the right front door of this automobile, the trunk lid, and a jack which was in the trunk. He lifted fingerprints of a sufficient quality to be able to make comparison for identification purposes. He lifted prints from the right door, glass, and also around the right door edge, and one print from a jack which was in the trunk of the car. The fingerprint which was lifted from the jack in the automobile was marked as State's Exhibit No. 2. The fingerprints lifted from the right door of this automobile were marked State's Exhibit No. 1. Mr. Weathersbee made a comparison of these fingerprints with the fingerprints of James Lee Primes in the files of the City-County Bureau of Identification. In his opinion the fingerprint marked State's Exhibit No. 1 was the fingerprint of the left middle finger of James Lee Primes. The fingerprint marked State's Exhibit No. 2 was the left index finger of James Lee Primes.

Defendant went on the stand in his own behalf. His testimony in brief summary tends to show these facts: He changed the flat tire on the automobile for Miss Daniels. He accompanied her in her automobile and had sexual intercourse with her but only because of

her insistence and demand that he do so. He did not harm her or threaten to harm her in any way. He did not use any force) or threaten to use force.

**[2-4]**    Rape is the carnal knowledge of a female person by force and against her will. *S. v. Crawford,* 260 N.C. 548, 133 S.E. 2d 232; *S. v. Jim,* 12 N.C. 142. The force necessary to constitute rape need not be actual physical force. Fear, fright, or coercion may take the place of force. *S. v. Thompson,* 227 N.C. 19, 40 S.E. 2d 620. While consent by the female is a complete defense, consent which is induced by fear of violence is void and is no legal consent. *S. v. Carter,* 265 N.C. 626, 144 S.E. 2d 826.

This is said in 44 Am. Jur., Rape, § 13, p. 910:

> "Consent of the woman from fear of personal violence is void. Even though a man lays no hands on a woman, yet if by an array of physical force he so overpowers her mind that she dares not resist, or she ceases resistance through fear of great harm, the consummation of unlawful intercourse by the man is rape. . . ."

Defendant contends that the statements and acts of his under the prevailing circumstances, as shown by the State's evidence, should not have induced fear or fright on the part of Miss Daniels, and the defendant had reasonable grounds to believe by the acts of the prosecuting witness that she was consenting for him to have sexual intercourse with her. Such an argument is based upon the supposition that the defendant's evidence is true, and ignores the testimony of Miss Daniels that the defendant pulled her into the woods when she was crying and pleading with him to let her alone, that she had never been touched before, that she was planning to get married soon, and that the defendant had her pinned back on the ground with his arms on her arms and saying, "Don't scream. If you do, I'll kill you," and under such circumstances had sexual intercourse with her.

**[5, 6]**    In considering the motion for a compulsory nonsuit in this case, we are not concerned with the weight of the testimony, or with its truth or falsity, but only with the sufficiency to carry the case to the jury and to sustain the indictment. Considering the evidence in the light most favorable to the State, we conclude that the motion for a judgment of compulsory nonsuit was properly denied. The assignment of error thereto is overruled.

As stated above in the recapitulation of the State's testimony, about 5:45 p.m. on the day after the alleged assault, Miss Daniels

in company with her fiance and Deputy Sheriff Richard Branch saw defendant get out of a pickup truck on Lenoir Street and walk east on that street toward Fayetteville Street. At that time Miss Daniels identified defendant as the man who had criminally assaulted her the night before. Afterwards Deputy Sheriff Branch picked defendant up and carried him to a magistrate's office in his automobile. There was a lineup at the jail. At that time counsel for the defendant objected because the evidence of the lineup at the jail was not material, and was prejudicial. The judge asked him if he wanted a *voir dire* hearing on that, and counsel for defendant replied, "No." The defendant excepted. In the lineup at the jail Miss Daniels identified the defendant. Defendant assigns the identification of him in the lineup as error.

[7]    Defendant contends that the identification of him in the lineup was incompetent and prejudicial in that the prosecutrix had already identified him previously before he was in the lineup, and the defendant's identity was not disputed, his defense being that he used no force and that the admitted intercourse was at the insistence and with the consent of the prosecuting witness. Defendant further contended that it tended to give the jury the erroneous impression that the defendant's defense was that he was not the party who had intercourse with the prosecuting witness and diverted attention from the real issue. There was no objection to the testimony of Deputy Sheriff Branch that the prosecuting witness identified defendant after he had gotten out of the pickup truck before Branch accosted him.

The testimony of defendant is clear and positive that he was at the scene and had sexual intercourse with the defendant at her insistence and with her consent. Considering all the facts of the case that the prosecuting witness had identified defendant after he had gotten out of the pickup truck before Deputy Sheriff Branch carried him to a magistrate's office, and that the defendant's defense was consent, it is our opinion, and we so hold, that the identification of him in the police lineup was not prejudicial and was not error. Obviously, the testimony of the prosecutrix identifying him in the lineup was admissible to corroborate the victim's testimony when she said "That's the man" when she saw him get out of the pickup truck immediately prior to the lineup. 7 Strong's N. C. Index 2d Witnesses § 5. We do not think that the identification in the lineup comes within the principles condemned by *United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149 and *Gilbert v. California,* 388 U.S. 263, 18 L. Ed. 2d 1178, for the simple reason that the identification

in the lineup had an independent origin in the prosecuting witness's identification of defendant just previously when she saw defendant get out of the pickup truck, and further she had ample opportunity to see him when he changed the flat tire on her automobile, when he rode with her down the road, and when he assaulted her. See *S. v. Wright,* 274 N.C. 84, 161 S.E. 2d 581.

Defendant assigns as error that the court in its charge used language amounting to an expression of an opinion. From a meticulous reading of the charge in its entirety, there is nothing to show that there was the slightest intimation from the judge as to the strength of the evidence or as to the credibility of the witnesses, or of a witness, and there is nothing in the charge that prejudiced the defendant and prevented him from having a fair and impartial trial. This assignment of error is overruled.

Defendant has several other assignments of error to the charge. Reading the charge in its entirety, it is clear that the trial judge gave equal stress to the contentions of the State and the defendant, and declared and explained the law arising on the evidence given in the case in a fair and impartial manner. A careful examination of defendant's assignments of error discloses no new question or feature requiring extended discussion as to the charge. The jury, under application of settled principles of law, resolved the issues of fact against the defendant. Neither reversible nor prejudicial error has been made to appear. The verdict and judgment below will be upheld.

No error.