STATE OF NORTH CAROLINA v. ONAS THOMAS

No. 7020SC79

(Filed 25 February 1970)

**1. Homicide § 21—   second degree murder — rifle wounds — sufficiency of evidence**

In a prosecution for murder in the second degree, the issue of defendant's guilt was properly submitted to the jury where the State's evidence tended to show that the body of the deceased, lying in the bedroom of defendant's home, had two bullet wounds, one of which was conclusively caused by a .22 caliber bullet; that defendant had in his pocket .22 caliber cartridges similar to those found on the floor of the bedroom and also a bill of sale for two .22 rifles; that the serial number on one of the rifles listed in the bill of sale corresponded with the serial number on a .22 rifle which was found about 300-400 yards from defendant's home; that the discovered rifle did not have a magazine rod; that a magazine rod for a .22 rifle was found in the room adjoining the bedroom and was of a type similar to the rod missing from the discovered rifle; and that defendant stated to officers that he had been heavily drinking with deceased on the day of the homicide, that deceased had tried to "fondle" him, and that he would not allow anybody to "mess with me."

**2. Homicide §§ 15, 21—   proof of crime — circumstantial evidence**

Circumstantial evidence is satisfactory in proof of matters of the gravest moment, including homicide cases.

**3. Homicide § 30— second degree murder — submission of issue of involuntary manslaughter — evidence**

The trial court in a second degree murder prosecution did not err in failing to submit an issue of involuntary manslaughter, where the State's evidence consisted of the fact that deceased was shot twice and of defendant's statements that the deceased had attempted to "fondle" him and that he would not allow anybody to "mess with him," and there was no evidence that the death was caused by culpable negligence.

APPEAL by defendant from *Crissman, J.,* 25 August 1969 Session of UNION County Superior Court.

Defendant was tried upon a bill of indictment charging him with the murder of Parks Jordan (Jordan). The Solicitor announced upon calling the case for trial that he would try the defendant for murder in the second degree.

Upon defendant's plea of not guilty, trial was by jury. The verdict was "guilty of manslaughter". Judgment of the court was that the defendant be imprisoned in the State Prison for the term of 8 to 12 years.

From the judgment imposed, the defendant appealed, assigning error.

*Attorney General Robert Morgan and Assistant Attorney General Sidney S. Eagles, Jr., for the State.*

*James E. Griffin for the defendant appellant.*

CAMPBELL, J.

[1] The defendant offered no evidence. The State's evidence is summarized as follows, except where quoted. On 18 November 1968 the defendant, together with his father and mother, lived in a rural area of Union County, North Carolina about 15 miles from Monroe and about 8 or 9 miles from Marshville. In response to a call, officers of the Union County Sheriff's Department went to the home of the defendant shortly after 7:00 o'clock P.M. The house consisted of four rooms, two of which were bedrooms. Upon arrival, the officers found the body of Jordan lying on the floor in a back bedroom. Jordan was lying on his back with a bullet wound in his stomach and one in his upper left leg. The wounds were about the size of a pencil. There were abrasions or cuts about his head. All the wounds appeared to be fresh. The defendant was not present, and the officers proceeded to ride around the countryside looking for him. Pursuant to a call, the officers returned to the house about 1:30 A.M. Officers

went to the front door and also to the rear door. The defendant came out the rear door with a pistol in his hand. Deputy Sheriff McCain fired a warning shot over the defendant's head after he had refused to throw the pistol down. The defendant then put the pistol in his pocket. The officers talked to the defendant about 10 minutes trying to get him to dispose of. the pistol. Deputy McCain colorfully described the situation as follows:

> ". . . He was not in custody at this time. I did not tell him about his rights as he still had his rights in his pocket. I think I talked to him about ten minutes, after which Mr. Thomas took his gun out and throwed it on the ground. He took it out of his pocket and we then advanced upon him, handcuffed him, and placed him in the back of [the] car."

The pistol was a foreign make .38 Special Derringer. It had one spent cartridge and one live cartridge in it.

The bedroom where Jordan's body was found was in disarray, the bedclothes were in a pile, and blood was "all over the place". There were twelve live cartridges and twelve spent cartridges on the floor. The cartridges were .22 caliber, long, hollow point. There were twelve bullet holes in the double window at the foot of the bed which were made by bullets shot from inside going out. The front doorknob of the house had three bullet holes in it. It was not determined whether these bullet holes were fresh or not, but the broken window glass between the window and the outside screen looked fresh. Thomas had in his pocket twenty-three cartridges similar to the .22 caliber cartridges found in the bedroom. Defendant also had in his pocket a bill of sale for two .22 rifles. One of these rifles the defendant had reported stolen. The other rifle had been bought that week, and the serial number corresponded with the serial number on a Remington .22 rifle which was found Friday morning, 22 November 1968 in the grass between the paved road and a wheat field, about 300 or 400 yards from the house where the defendant lived. This rifle did not have a magazine rod in it. A magazine rod for a Remington .22 rifle was found in the living room adjoining the bedroom where the body was found. This rod was of a type similar to the rod missing from the rifle.

The County Medical Examiner, an admitted medical expert, testified that in his opinion Jordan's death was proximately caused by the bullet wounds. Two lead bullets were extracted from Jordan's body. One was "just a little piece of splattered up metal". The other was a .22 caliber and was a hollow point and of the general appearance of the other cartridges found in the bedroom. It could not be

ascertained whether or not it had been fired from the rifle which was found.

The defendant after having been advised of his constitutional rights told the investigating deputy sheriff that he had gotten up with Jordan in Marshville, Monday morning, 18 November 1968. The defendant got a taxicab to take him to Monroe, and Jordan wanted to go with him. In Monroe, the defendant purchased a gallon of whiskey consisting of two quarts of Pembroke and four pints of grain alcohol. They then proceeded to the defendant's home. On the way they took two or three drinks apiece.

> "When he arrived there, his father and mother were present and they told him that if he was going to start drinking, they were going to leave. He told them not to leave and he would leave himself. And that he and Jordan left the house and went out to the barn in back of the house in the edge of the woods. That they started drinking. They were drinking on this Pembroke; that they drank up one quart and started on the second quart, and that Jordan went to putting his arm around him, apparently loving him up; he told him to keep his hands off him, that he didn't go for that kind of stuff; and they left the barn and went back to the house, and there wasn't anybody present, that is, that his mother and father had left, and that they, he and Jordan, were the only ones there at that time.
>
> He did not tell me what time they went back to the house but they had stayed at the barn a good long while. . . ."

Another officer testified

> "And I asked him what had happened at the house, he was hesitant about what happened at the house. I asked him why did he shoot Parks. When I asked why he shot Parks he said, he told me, says, 'Listen, don't no god damn body mess with me.' . . ."

A neighbor of the defendant who lived about a half a mile away testified that he saw the defendant about 7:00 o'clock P.M. on 18 November 1968 and that at that time the defendant was drunk and wanted to be taken home. He stated that there was somebody hurt up at his house and he wanted someone to go with him and see. About this time an ambulance and officers went by, and the neighbor went on down to the defendant's house but did not take the defendant with him. It was at this time that Jordan's body was found in the house by the officers.

Defendant contends that the court committed error in overrul-

ing his motion for nonsuit. The applicable rule is stated in *State v. Primes*, 275 N.C. 61, 165 S.E. 2d 225 (1969), as follows:

> ". . . On such a motion the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable intendment thereon and every reasonable inference therefrom."

**[2]** The evidence in the case is circumstantial. However, the rule is that circumstantial evidence is satisfactory in proof of matters of the gravest moment, including homicide cases. *State v. Lawson*, 6 N.C. App. 1, 169 S.E. 2d 265 (1969), (certiorari denied, 276 N.C. 85).

**[1]** Considering all the State's evidence in the light most favorable to it, and, as required, giving it the benefit of every reasonable and legitimate inference to be drawn therefrom, we are of the opinion, and so hold, that there was sufficient evidence of the defendant's guilt to require the submission of the case to the jury. The trial judge did not commit error in overruling the motion for nonsuit. The evidence in this case places it in line with *State v. Lawson*, *supra*, and distinguishes it from the evidence in the case of *State v. Cutler*, 271 N.C. 379, 156 S.E. 2d 679 (1967).

**[3]** The defendant also assigns as error the failure of the court to instruct the jury they could return a verdict of guilty of involuntary manslaughter.

> "Involuntary manslaughter is the unlawful killing of a human being, unintentionally and without malice, proximately resulting from the commission of an unlawful act not amounting to a felony, or resulting from some act done in an unlawful or culpably negligent manner, when fatal consequences were not improbable under all the facts existent at the time, or resulting from the culpably negligent omission to perform a legal duty." 4 Strong, N.C. Index, Homicide, § 6, p. 198.

In this case there is no evidence in the record tending to show that the death of Jordan was caused by culpable negligence. The evidence is to the contrary. The defendant's statement about Jordan attempting to fondle him at the barn and his later statement "[l]isten, don't no god damn body mess with me" and the fact that Jordan was shot twice and not just once all tend reasonably to show an intentional shooting of Jordan by the defendant.

All assignments of error presented on the record have been considered, and we find no prejudicial error.

No error.

PARKER and HEDRICK, JJ., concur.