STATE OF NORTH CAROLINA v. FREDDY RAY JONES

No. 63

(Filed 15 December 1971)

**1. Criminal Law § 104— motion for nonsuit — consideration of defendant's evidence**

On motion for nonsuit in a criminal case, defendant's evidence, unless favorable to the State, is not to be taken into consideration; however, when not in conflict with the State's evidence, it may be used to explain or clarify that offered by the State.

**2. Homicide § 14— burden of proof**

In any prosecution for a homicide the State must prove two things: (1) that the deceased died by virtue of a criminal act; and (2) that the act was committed by the defendant.

**3. Homicide § 21— insufficiency of evidence of defendant's guilt**

In this prosecution of defendant for the murder of his wife, the State's evidence, while raising a strong suspicion of defendant's guilt, was insufficient for submission to the jury where it tended to show only that defendant's wife was murdered by an assassin who shot her in the back and in the head, that defendant had the opportunity to commit the crime, and that at the time his wife was killed defendant was drunk and intermittently violent.

APPEAL by defendant from *Ervin, J.*, 16 November 1970 Criminal Session of DURHAM, transferred from the Court of Appeals for initial appellate review by the Supreme Court under the general order of 31 July 1970, entered pursuant to G.S. 7A-31(b)(4).

Defendant, indicted under G.S. 15-144, for the murder of his 32-year-old wife, Peggy Chestnut Jones, on 20 December 1969, was convicted of murder in the second degree. He appeals a sentence of 15-18 years.

*Attorney General Morgan; Staff Attorney Lloyd for the State.*

*Arthur Vann for defendant appellant.*

SHARP, Justice.

All the evidence tends to show that Peggy Jones (Peggy) was murdered on the night of 20 December 1969 by an assassin who fired three .22-caliber bullets into her back and three into her head back of the left ear. The nature of the wounds and the powder burns on the flesh indicated to the pathologist who

autopsied the body that the weapon was discharged not more than six inches from her head.

The only question presented by this appeal is whether the State offered substantial evidence that defendant, Peggy's 36-year-old husband, was the murderer. The State's evidence is entirely circumstantial. There were no eyewitnesses to the crime, and the murder weapon was not produced. Defendant made no out-of-court statements with reference to the homicide. At the trial he offered evidence but did not testify. The testimony of his witnesses did not aid the State's case or suggest the perpetrator of the crime.

On 20 December 1969 defendant operated the business known as J. P. Jones & Son, a general store, on Angier Avenue in Durham. His residence was located on the same side of the street, 50 to 75 yards west of the store. The two lots were separated by an unpaved street, Jones Circle. Defendant and Peggy worked regularly in the store with three full-time employees. The store was in good financial condition and, on the evening of December 20th, it was open for the pre-Christmas business.

The State's evidence, and that of defendant which supplements and explains it, tends to show the following course of events involving Peggy and defendant on the evening of 20 December 1969:

About 8:05 p.m., Mrs. Marjorie Taylor and her 12-year-old daughter went to the Jones store to look for a piece of furniture. Defendant did not have it, but he produced a furniture catalog and told her that he could "get it for her." His face was flushed; he had "the odor," and she could tell that he had been drinking. She did not care to do business with him in that condition; so she terminated the discussion by buying a small item for her daughter. While she was paying for it, Peggy came in the front door. As she passed the cash register she said to defendant, "What in the hell is the register drawer doing open, Freddy?" It was Mrs. Taylor's impression, however, that defendant did not hear what she said.

Peggy walked toward the back of the store, and moments thereafter Mrs. Taylor heard something fall and break. It sounded like glass. At that time it was between 8:25 p.m. and 8:35 p.m.

Between 8:40 and 8:45 p.m. defendant arrived in his green pickup truck at the Durham County ABC store on Miami Boulevard, about one and a half miles from J. P. Jones & Son. Defendant was so drunk that he fell to the ground when he got out of the vehicle. However, he got up, entered the store, put five or six dollars on the counter, and demanded "a pint." Defendant was wearing a light tan windbreaker (State's Exhibit 11) and dark pants. He appeared neat and had no abrasions or scratches on him. J. H. Bailey, a salesman, who had known defendant for years, refused to sell him any liquor because he was drunk. This refusal angered defendant, and he "acted like a wild man." Bailey was about to call the sheriff when J. O. Strayhorn came in and said he would take defendant home.

Strayhorn got defendant out of the ABC store, but when he tried to take him home he "couldn't reason with him." Defendant got into his truck, "backed up and took off." He narrowly missed colliding with a tractor-trailer unit as he entered the highway.

Between 9:05 and 9:15 p.m. defendant drove his pickup truck into the yard of Graham Lovitte, approximately two and a half miles from the Miami Boulevard ABC store. Earlier in the day defendant had agreed to deliver a TV set which Lovitte had purchased from him. Hearing a noise, Lovitte went outside to find defendant lying on the ground. He had driven his truck into the back of a parked car. Defendant was not hurt at all. He was drunk, incoherent, and determined to drive the truck away. Lovitte took possession of his keys and tried to telephone defendant's brother, Michael. Being unable to reach him he called defendant's mother who arrived about 9:25 or 9:30. She persuaded defendant to get into her automobile and drove him to her home, located three or four doors from the Jones store on Angier Avenue. Lovitte followed them in his car.

About 9:40 p.m., I. P. Breedlove and his family stopped at the Jones store. It was unlocked and well lighted; the TVs were playing loudly. Finding no attendant upstairs and getting no answer when he called downstairs, Breedlove "got an uneasy feeling." Leaving his family in the car, he walked across Jones Circle to the Jones residence looking for defendant. The house was well lighted; the TV was playing. However, no one answered his knock and call. As he was leaving, a car, traveling at a high rate of speed, drove between the house and the store and disappeared behind the store. Breedlove immediately went to

the back of the store but found no car. He then drove to the home of defendant's mother. She was not at home, but he informed the young girl who came to the door (defendant's niece, Pam) that the store was unlocked and deserted. He told her that he would return to the store and wait in front until somebody came. In a few minutes defendant's brother, Michael Jones, came to the store, and Pam arrived shortly thereafter. Michael expressed his appreciation to Breedlove, who then departed.

In the meantime defendant and his mother had arrived at her home and Lovitte had gone in search of Michael. He went to the store and observed Michael coming from defendant's house. After Breedlove's departure, Michael had gone across the street to defendant's home, leaving Pam at the store. After he had "rung the door bell, knocked and hollered," and received no answer, Michael turned the knob and went in. All the lights were on, including those on the Christmas tree; the television was playing. The kitchen stove was on. The pressure cooker was vibrating and a ham was cooking in the oven. In the living room a pile of snap beans were partially strung and snapped. He cut off the stove and returned to the store to be met by Lovitte, who told him defendant was at his mother's in a drunken condition, and she had great need for his assistance. Lovitte helped him cut off the televisions at the store. Neither one went down into the basement. Michael then locked the door and, about 10:00 p.m., he and Pam went to his mother's home. He found defendant very intoxicated and having difficulty breathing.

Michael (as defendant's witness) testified that his mother summoned a neighbor, Wayne Fowler, to help him handle defendant; that between 10:15 and 10:30 his sister, Mrs. Hight, arrived, and the two women left to go to defendant's home. (Apparently they went in search of Peggy after having tried unsuccessfully to reach her.)

Sometime between 10:30 and 11:00 p.m. Peggy's mother, Mrs. B. T. Stephens, who had last talked to her daughter about 7:30 p.m. on the telephone, went to the Jones residence with her husband "to find out what was wrong with Peggy." They too found the house deserted—presumably just as Michael had left it. Mrs. Hight and defendant's mother arrived at the house shortly after they did. Mr. Stephens and Mrs. Hight then went to the store. Mrs. Hight unlocked the door with Peggy's key, which Mrs. Stephens had found and given her. Mrs. Hight dis-

covered Peggy's body downstairs in the storage room at the back and cried out for Mr. Stephens. Peggy was lying on her right side, somewhat on her face, in a pool of partially dried blood. The blood on her face and hair was dried. Mr. Stephens did not step in the blood. Mrs. Hight first called an ambulance and then telephoned Michael. He left defendant with Wayne Fowler and came immediately. As soon as he viewed the body he called the sheriff.

The sheriff's office received the call to come to Jones' store at 11:12 p.m. Deputy Wilkerson arrived there at 11:19 and immediately called the medical examiner and Deputy Allen. Deputy Gray and Dr. D. R. Perry, Durham County medical examiner, arrived at the Jones store about 11:30 p.m.

Dr. Perry examined the body, which he found in a pool of blood in the storage room. The body was cold; the blood on it dry and crusty. The blood on the floor was also dry. It had been stepped in and smeared. Footprints were visible on the floor. In Dr. Perry's opinion, Peggy had been dead a minimum of three hours and a maximum of five. Deputy Sheriff W. A. Allen, who arrived shortly after Dr. Perry, inspected the office space in the rear of the store on the street floor. He found desk drawers all closed. In one he discovered a money bag containing currency. In plain view on top of a desk was a twenty dollar bill with a note attached to it. The drawer of the cash register was open; it had money in it. In a desk drawer he observed some pistols. One was a semi-automatic military-type gun; one a blank pistol; and one a Spanish-made pistol. In the storage room he saw six .22-caliber revolver-type pistols in a pasteboard box. It was stipulated that the records of Brown-Rogers-Dixon Sporting Goods of Winston-Salem showed a sale of six .22-caliber revolvers to J. P. Jones & Son on 2 December 1969.

(Michael testified that when he and Pam went to the store to meet Mr. Breedlove, they had found a considerable amount of change "scattered helter-skelter" on the floor by the cash register and no currency in the register then. While he went to defendant's house looking for him and Peggy, Pam had picked up the money and put it in the cash register.)

After the body was removed, Michael and Mrs. Hight went with Officers Wilkerson and Gray to arrest defendant at the home of his mother. It took Michael, the two officers, and anoth-

er man to get defendant into the patrol car and take him to jail. There, in his right-hand pocket, Wilkerson found five empty .22-caliber cartridges and three live rounds. On the arm of his jacket (State's Exhibit 11) they saw several spots, which were later determined to be type O blood. He found no cuts or signs of bleeding about his person. Defendant has blood type "O" and so did deceased.

As soon as defendant was placed in the cell block he began to vomit, dig at his chest, complain of chest pains, and say he could not breathe. The four men who had brought him to jail took him to the emergency room at Watts Hospital. There he began screaming and "carrying on" to such an extent that he had to be restrained. Dr. Thakur examined him at 1:10 a.m. on December 21st. He made a blood test, pumped his stomach, x-rayed his chest and gave him shots of paraldehyde in the hip to calm him down. Defendant had no external injuries of any kind. Dr. Thakur's diagnosis was "overdose of alcohol and possibly of stimulant drugs." (Michael testified that defendant kept asking him and others to call Peggy and Jeff, his son, "to come to his comfort" and that defendant told Dr. Thakur his wife hit him in the chest and he should mash it and hit him also.) Defendant was returned to jail sometime around 3:00 a.m., and Michael remained with him the rest of the night.

Defendant's shoes were not examined for blood on the soles and no paraffin or Harrison test was made on his hands to determine whether he had recently fired a gun.

The following morning, around 7:00 to 7:30, Deputy Allen made a further investigation at the Jones store. In the store-room where Peggy's body had been found he saw a broken whiskey bottle on top of a crate of soft drinks. There was no sign of liquid on the floor or surrounding area. He also observed that one of the quarter panes was broken in one of the windows in the basement door. The glass was on the inside of the building on the floor.

Defendant's evidence tended to show that Peggy was seen alive between 8:45 and 8:50 p.m.; that in the opinion of the ambulance attendant, who removed her body, she had been dead only one and a half to one and three-fourths hours; that on 17 December 1969 defendant had taken a .22-caliber pistol to the gunshop for repairs and had pulled some .22 bullets

from the pocket of his jacket (S-11) saying that he had "fired five rounds out of here"; that this gun remained in the shop until January 1, 1970, when Michael retrieved it; that the blood specks on the jacket were the blood of a customer who had had a nosebleed while loading a chair he had purchased at the Jones store on the morning of December 20th; and that defendant's character was good "except for drinking."

[1] In considering a motion for nonsuit in a crimnial case the evidence must be considered in the aspect most favorable to the State. *State v. Pope*, 252 N.C. 356, 113 S.E. 2d 584. The defendant's evidence, unless favorable to the State, is not to be taken into consideration. However, when not in conflict with the State's evidence, it may be used to explain or clarify that offered by the State. *State v. Sears*, 235 N.C. 623, 70 S.E. 2d 907.

[2] In any prosecution for a homicide the State must prove two things: (1) that the deceased died by virtue of a criminal act; and (2) that the act was committed by the defendant. *State v. Palmer*, 230 N.C. 205, 52 S.E. 2d 908. "When a motion is made for a judgment of nonsuit or for a directed verdict of not guilty, the trial judge must determine whether there is substantial evidence of every essential element of the offense. . . . It is immaterial whether the substantial evidence is circumstantial, or direct, or both." *State v. Davis*, 246 N.C. 73, 76, 97 S.E. 2d 444, 446. *Accord, State v. Burton*, 272 N.C. 687, 158 S.E. 2d 883; *State v. Stephens*, 244 N.C. 380, 93 S.E. 2d 431.

[3] The State's evidence in this case establishes a brutal murder. It shows that defendant had the opportunity to commit it and "beget[s] suspicion in imaginative minds." *State v. Palmer, supra* at 214, 52 S.E. 2d at 914. All the evidence engenders the question, if defendant didn't kill his wife, who did? To raise such a question, however, will not suffice to sustain a conviction.

The statement of Merrimon, Chief Justice, in *State v. Goodson*, 107 N.C. 798, 801, 12 S.E. 329, is pertinent here: "The full summary of the incriminating facts, taken in the strongest view of them adverse to the prisoner, excites suspicion in the just mind that he is guilty, but such view is far from excluding the rational conclusion that some other unknown person may be the guilty party."

The circumstances raise a strong suspicion of defendant's guilt, but we are obliged to hold that the State failed to offer substantial evidence that defendant was the one who shot his wife in the back. The evidence proves only that at the time his wife was killed defendant was degradedly drunk and intermittently violent.

The motion for nonsuit must be sustained. *State v. Pope, supra; State v. Carter,* 204 N.C. 304, 168 S.E. 204, and cases cited therein.

Reversed.