STATE OF NORTH CAROLINA v. SAMUEL A. POOLE

No. 18

(Filed 10 April 1974)

**Burglary and Unlawful Breakings § 5— first degree burglary — sufficiency of circumstantial evidence**

Trial court in a first degree burglary case erred in denying defendant's motion for nonsuit where the evidence tended to show that the homeowner did not identify defendant as the intruder, defendant was in possession of a red panel truck and a sawed off rifle as late as seven hours before commission of the crime, there was no evidence as to where the truck was during the seven hours immediately prior to the crime but a police officer found it within minutes of the crime in the vicinity of the crime scene where defendant said he had left it when it ran out of gas, a button which was found at the crime scene matched those on a shirt found during a second search of defendant's house, and there was no evidence relating to fingerprints inside the house or track prints outside the house.

Jusice LAKE dissenting.

Justices HIGGINS and HUSKINS join in the dissenting opinion.

APPEAL by defendant from *Braswell, J.,* 13 August 1973 Session of MOORE Superior Court.

Defendant was tried on an indictment which charged that, on 19: May 1973, defendant "unlawfully and wilfully did feloniously and burglariously break and enter, between the hours of 9:00 p.m. and 9:30 p.m. in the night of the same day, the dwelling house of Tennie A. Maness, Rt. 1, Robbins, North Carolina, there situate, and then and there actually occupied by the said Tennie A. Maness, with the felonious intent he, the said Samuel A. Poole, to forcibly and violently ravish and carnally know Tennie A. Maness, a female occupying and sleeping in said dwelling house, without her consent and against her will."

The only evidence was that offered by the State. Summarized, except when quoted, the testimony of each of the State's witnesses is narrated below.

### Miss Tennie Maness

On 19 May 1973, she was living alone in her "four-room brick house" on Route 1, Robbins, in Moore County. About 9:00 p.m., "just as it was getting dark," she returned to her home after a visit with her brother, Wilmer Maness, who lived about a quarter of a mile from her.

Inside her home, alone, "about 9:15 or 9:30 p.m.," she was in bed, reading, when she heard a noise at her *front* door. Her two doors, front and side, and all windows, had been closed and locked. It was then dark and the only light burning was in her bedroom. She called Wilmer and asked him to come to her house "because someone was at the front door."

"Five or ten minutes later," she heard "a cutting noise like on metal or glass" at the *side* door. She then "turned the back light on," thinking "it would frighten them." She "didn't hear them come in." Thinking "they were going to break in," she opened the bedroom door to try "to get out." When she opened the door, she saw "a colored man and tall" standing in the hall "approximately 10 feet from [her] bedroom door."

The hall area where this man was standing "was lighted by [her] bedroom light." The man had "a short-barreled gun." She didn't see "the stock of the gun." He was "just standing still" and "didn't say anything." She "just caught a glimpse" of him. She didn't see his clothes and didn't know "whether he had on a hat." She slammed the door as quickly as she could and locked it. She then climbed up on a chair beside her bedroom

window, raised the window, opened the screen, and climbed out "through the bottom section of the window." It was "probably 12 feet from the bottom of the window to the ground." She estimated that this required "probably two minutes' time."

"After going through the window," she ran to the side of the house and turned toward the road, "just as quick as [she] could." When she "was 75 feet away," she heard a man say, "Stop, I've got a gun." She stopped "for one minute," then saw Wilmer in her yard and "started screaming and running toward [her] brother."

She did not know when the person behind her left, whether he was running when he left or where he went. She has "a slight hearing loss."

She estimated it "was probably only ten minutes from the time he broke in till [her] brother got there." She did not go back to her house until the next morning. She then found that the lock on her bedroom door was broken. "[She] did not hear anything which caused [her] to think it was being broken. The bedroom door was a new door and had only been on there 4 or 5 years. It was in good condition before [she] left [her] bedroom." "The curtains on the window are white, probably cotton or a mixture of cotton and a synthetic fabric."

She "had never seen the defendant before." The person(s) referred to in her testimony did not touch her. She did not know how the man she saw in the hall got out of the house.

### DEPUTY SHERIFF DALTON CHEEK

He arrived at the residence of Miss Maness at approximately 9:33 p.m. on May 19th. There he saw and talked with Wilmer Maness. He did not see Miss Maness until the following day.

Upon his examination of the premises he found the glass in the side door was broken. There was glass "immediately inside the side door." The "bedroom lock had been busted off." The window to the bedroom was raised. Half of the curtain was still intact. The other half was "on the ground approximately 2 or 3 feet from the house immediately below the window." At approximately 3:30 a.m. on May 20th, he first saw a dark brown button (Exhibit No. 9) "in the fold of the curtain that was laying on the ground directly beneath the open window of the Tennie Maness residence." He placed this button in an envelope.

State v. Poole

He showed it to Miss Maness the next day and "asked her if it came from any of her garments." [He testified, without objection, that Miss Maness told him "it did not come from any of her clothing."]

On Sunday, May 20th, he saw defendant at approximately 9:30 a.m. at the Robbins Police Station. Defendant "is approximately 6 feet 2 inches." He told defendant "there had been a lady's house went into the night before" and he "needed to talk with [defendant] about it." Thereupon, he advised defendant of his "constitutional rights" and, after reading the paper, defendant signed a waiver of rights.

At approximately 9:45 a.m. he (Cheek) asked defendant if he minded if they went to his premises, that they "would be looking for anything that would be incriminating on his part." [There was no testimony on direct examination of a visit to defendant's premises *during the morning* of May 20th.]

At 5:45 p.m. at the jail he wrote up a statement (Exhibit 7), which was signed by defendant, in which defendant gave his "full consent to Deputies of the Moore County Sheriff's Department to inspect [his] premises for any incriminating evidence in the Tennie A. Maness breaking and entering case." Accompanied by defendant, he went to defendant's residence, searched it and removed a shirt (Exhibit 8) from which one button, the second from the bottom, was missing.

On the morning of May 20th, defendant told him that he ran out of gas when driving a red panel truck on a rural paved road near the residence of Miss Maness. He (Cheek) had seen the truck in that vicinity at approximately 9:33 p.m. on May 19th. It was located approximately 2/10 of a mile south of the residence of Miss Maness. There was "no residence close to the panel truck and the Maness residence." There was "no ignition key in the truck."

The following day at noon he obtained an ignition key and started the vehicle without any trouble. He "just started the truck up and let it run for a while and shut it off." Defendant stated he had left the truck where he (Cheek) had found it; that, when he left the truck, he traveled south on the rural paved road and was picked up by two boys who carried him to his residence. Defendant made no statement as to when he was picked up and did not give any name of the persons he said picked him up.

When asked "whether he owned any weapon of any kind on that evening," defendant stated "he had not had a weapon in several years."

On cross-examination, Cheek testified as follows:

When he first searched defendant's residence at approximately 9:45 a.m. on May 20th he "looked in all of the rooms." At that time Officer Cockman of the Robbins Police Department was with him. About 5:45 p.m., when defendant gave him permission to search again, he told defendant that he "would be looking for a garment of some type to match the button [he] had found." Deputy Sheriff Whitaker was with him on the second search. On the second search he found the shirt (Exhibit 8) in the front bedroom next to the bed. From 9:30 a.m. on May 20th, when he first saw defendant, defendant was either in his (Cheek's) custody or in the custody of someone in the Moore County Sheriff's Department.

He did not get any fingerprints at the Maness residence. He talked to Miss Maness on the telephone at approximately 3:30 p.m. on May 20th. He first saw the truck at approximately 9:33 p.m. on May 19th when en route to the residence of Miss Maness. He checked the vehicle at that time, but did not operate it on the night of May 19th. He had the vehicle "towed in and stored at Yow's Garage in Robbins." It "was in Yow's Garage that [he] started the vehicle." Someone else towed the vehicle to Yow's Garage.

Cheek testified on redirect examination as follows:

The vehicle was towed to the garage because there was no ignition key. Mr. Bradley brought the ignition key down the next day.

He (Cheek) delivered the button and shirt to Mr. Pearce at the SBI Laboratory in Raleigh on May 23rd. The button was in the same condition it was in when he first obtained it from the folds of the curtain on May 20th. There were threads through the holes in the button. The shirt was in the same condition it was in when he first obtained it from defendant's residence.

### WILLIAM E. PEARCE

As an employee in the Chemical Laboratory of the State Bureau of Investigation his duties included the analysis of various items of evidence in connection with criminal investigations.

On May 24th and 25th, he made examinations and comparisons of the button (Exhibit 9) and the shirt (Exhibit 8) which Cheek had submitted to him on May 23rd. There were black cotton threads in Exhibit 9 and in the buttons on Exhibit 8. There were six strands on one side and seven strands on the other. On the back, "the strands were knotted." These buttons were put on by a machine. Exhibit 9 was "the same in all respects, measurements, diameter, color, number of holes and depressions" as the buttons on Exhibit 8.

To make the comparison, he used a button which he removed from the pocket of the shirt. He "did not remove the buttons in the line of the shirt, for fear they might be related for further evidence." He compared them "cursorily without taking them off the shirt." He compared the knot on the buttons used by him for comparison with that "tied on the back of the remaining buttons on the shirt," and "it appeared" they were "tied in the same manner."

He concluded his testimony on direct examination by stating that in his opinion "Exhibit 9 could have been torn from the shirt, Exhibt 8."

On cross-examination, he testified that the label on the shirt read, "Washington Dee and Cee, permanent press shirt"; that the shirt appeared to be "a common, everyday workshirt, gray cotton"; that "that button could have come from a shirt of that particular type made by the same manufacturer" but that he wouldn't want to base his opinion on whether the shirt was made by the same manufacturer; and that the button "certainly came from a shirt which had other buttons on it which were identical to it."

BOYCE DOWD testified that he sold defendant "a sawed-off .22 rifle" on or about 12 May 1973; and that defendant paid him $20.00 for it and left "with the rifle."

ROBERT MOSELEY testified that he saw defendant on May 19th "about 1:00 or 2:00 in the afternoon"; that defendant was traveling in a red panel truck; that he and defendant went to the liquor store in Carthage "about 2:00"; that, when he got out to go home, "about 2:30," he saw "a .22 automatic rifle with the barrel sawed off to about 18 inches" in the front of the truck "where you change the gears"; and that, when asked where he got the rifle, defendant said "it wasn't his." On cross-

examination, he testified that he and defendant "had not been drinking that day"; that they had gone to Carthage to get something to drink; and that he had been convicted of shooting defendant about three years back and was then on probation for it.

WILLIAM RALPH BRUCE testified that he had possession of a red panel truck which he used "to pick up work hands"; that "on Friday morning" he allowed defendant to drive the truck; that the next time he saw the truck was on Sunday morning "about 1:00"; that the truck was then "close to the North Moore School"; and that he did not know how much gasoline was in the truck when he let defendant have it.

LESTER BRADLEY testified that he was "self-employed hauling poultry"; that, on or about May 19th, he permitted Bruce, his employee, to have possession of his (Bradley's) red panel truck, which Bruce used to "pick up help in the area and bring them to Siler City"; that he saw the truck again on Sunday in the Yow Garage; that the foreman of the crew for which Bruce works drove it away; that the "gasoline gauge [was] broken"; and that it took 13.7 gallons to fill it up "after it had made its route to pick up the hands and come back to Siler City, a distance of 38 miles."

HARRY PERSON testified that he was 15 years old and lived in Robbins; that he saw defendant on May 19th, "in the evening," but "[didn't] really know what time it was"; that, "at the store," Officer June Cockman "asked [him] questions"; that, accompanied by James Davis, his cousin, he left the store "about 20 minutes later to go home"; that he saw defendant "in the path leading out to the main road"; that "[t]he path starts at the road and goes out to the store"; that defendant was alone; and that defendant "was coming toward [him] . . . was coming towards the road to the store."

Deputy Sheriff Cheek, when recalled, testified to extrajudicial statements previously made to him by Moseley and Dowd which tended to corroborate the testimony of these witnesses at trial.

Other evidence will be noted in the opinion.

The jury returned a verdict of guilty of burglary in the first degree and judgment imposing a sentence of death was pronounced. Defendant excepted and appealed.

State v. Poole

*Attorney General Robert Morgan and Assistant Attorneys General William W. Melvin and William B. Ray for the State.*

*Seawell, Pollock, Fullenwider, Van Camp & Robbins by P. Wayne Robbins; Chambers, Stein, Ferguson & Lanning by Adam Stein; and David E. Kendall, NAACP Legal Defense Fund, New York, New York, for defendant appellant.*

BOBBITT, Chief Justice.

Defendant assigns as error the denial of his motion under G.S. 15-173 for judgment as in case of nonsuit. The question presented by this assignment is whether the evidence was sufficient to warrant the submission thereof to the jury and to support a verdict of guilty of the criminal offense charged in the indictment.

The rules for testing the sufficiency of the evidence to withstand defendant's motion are well established. 2 Strong, N. C. Index 2d, Criminal Law § 104. The evidence most favorable to the State must be considered as true. When so considered, was it sufficient to warrant a finding that the crime charged was committed and that it was committed by defendant? *State v. Goines,* 273 N.C. 509, 513, 160 S.E. 2d 469, 472 (1968), and cases cited.

The testimony of Miss Maness was sufficient to support a finding that an unauthorized man unlawfully broke into and entered her occupied dwelling between 9:15 and 9:30 p.m. on Saturday, 19 May 1973. *Arguendo,* we assume the sufficiency of the evidence to warrant a finding that the intruder's intent when breaking and entering was to commit the felony of rape. The crucial question was whether the evidence was sufficient to warrant a finding that defendant was the unlawful intruder. In respect of this crucial question, the State's case depends wholly on circumstantial evidence.

The well established rule, cited with approval in numerous subsequent cases, is stated by Justice Higgins in *State v. Stephens,* 244 N.C. 380, 383-84, 93 S.E. 2d 431, 433-34 (1956), as follows: "[T]here must be substantial evidence of all material elements of the offense to withstand the motion to dismiss. It is immaterial whether the substantial evidence is circumstantial or direct, or both. To hold that the court must grant a motion to dismiss unless, in the opinion of the court, the evidence excludes

every reasonable hypothesis of innocence would in effect constitute the presiding judge the trier of the facts. Substantial evidence of guilt is required before the court can send the case to the jury. Proof of guilt beyond a reasonable doubt is required before the jury can convict. What is substantial evidence is a question of law for the court. What that evidence proves or fails to prove is a question of fact for the jury."

The crucial question is whether there was substantial evidence that this defendant was the intruder who entered Miss Maness's home on the night of 19 May 1973. This question can be answered only after close analysis of the evidence.

Miss Maness did not identify defendant as the intruder. The only time she saw the intruder was when she "just caught a glimpse" of him when he was "just standing" in the hall, approximately 10 feet from the door of her bedroom. The hall area was lighted "by [her] bedroom light." The intruder did not speak. He was "a colored man and tall." He had a "short-barreled gun." Miss Maness didn't see his clothes and didn't know whether he was wearing a hat. Although she learned the next day that the lock to her bedroom door had been broken, "[she] did not hear anything which caused [her] to think it was being broken."

Miss Maness did not see the man outside who called to her that he had a gun and ordered her to stop. No witness testified to the identity of this man. There is evidence that he left the vicinity of Miss Maness's home when Wilmer Maness arrived. The evidence is silent as to the direction in which he was traveling when he left. Wilmer Maness did not testify.

Cheek testified defendant "is approximately 6 feet 2 inches." Dowd testified he sold defendant "a sawed-off .22 rifle" on or about May 12th. Moseley testified that, at 2:30 p.m. on Saturday, May 19th, such a rifle was in a truck operated by defendant.

Bruce, an employee of Bradley, testified that on Friday, May 18th, he (Bruce) had given defendant permission to drive Bradley's red panel truck. Cheek testified he first saw the truck on Saturday, May 19th, at 9:33 p.m., when going to Miss Maness's house; that the truck, unattended, was approximately 2/10 of a mile south of Miss Maness's house; that he checked the vehicle but did not operate it; that the ignition key was missing; that the next day, Sunday, May 20th, he (Cheek)

arranged for the truck to be towed to Yow's Garage; that Bradley, the owner of the truck, brought an ignition key to Yow's Garage; and at that time he (Cheek) "just started the truck up and let it run for a while and shut it off."

Person testified that on Saturday, May 19th, "in the evening," he was "at the store," at which time Officer June Cockman "asked [him] questions"; and that, when he (Person) left the store "to go home" he saw defendant, alone, "coming toward [him] . . . coming towards the road to the store." Cheek, when recalled, testified that he was "familiar with the store referred to by Mr. Person," and that "the store is approximately ¾ miles from the nearest point to the paved road, 1479."

The evidence reviewed above tends to show that defendant had possession of the truck and of "a sawed-off .22 rifle" as late as 2:30 p.m. on Saturday, May 19th; and that he was seen "coming towards the road to the store" by Person, who didn't "really know what time it was."

There was no evidence as to where the truck was on Saturday, May 19th, from 2:30 p.m. until 9:33 p.m. We note Cheek's testimony that defendant told him that, "as soon as he left the truck, he traveled south on the rural paved road and was picked up by two boys that carried him to his residence." We further note Cheek's testimony that defendant made no statement "as to what time he was picked up" and "did not give the names of any persons who he said picked him up." Apart from these statements attributed to defendant, there was no evidence as to where defendant was from 2:30 p.m. on Saturday, May 19th, until Person saw him at some unspecified time "in the evening," and no evidence as to where defendant was from the time Person saw him until Cheek saw him on Sunday, May 20th, at approximately 9:30 a.m., at the Robbins Police Station.

Cheek, when recalled, testified to the distance from the store referred to by Person to the nearest point of the paved road. Originally, Cheek had testified that "[t]here is a store approximately two miles from the Maness residence in the Belview section." Whether this is the store referred to by Person is obscure.

The evidence reviewed above tends to place defendant 2/10 of a mile south of Miss Maness's house at some unidentified time on Saturday, May 19th. There was no evidence relating to fingerprints of the man inside the house or relating to track

prints of the man outside the house. The man inside the house did not speak. There was no evidence tending to identify the voice outside the house as that of defendant.

To place defendant at the scene of the crime, the State relies upon testimony relating to a dark brown button which Cheek found at approximately 3:30 a.m. on Sunday, May 20th, "in the fold of the curtain that was laying on the ground directly beneath the open window of the Tennie Maness residence." At about 5:45 p.m., during his *second* search of defendant's residence, Cheek found in the front bedroom a shirt from which one button was missing. Pearce testifed to his examination and comparison of the button found by Cheek and the remaining buttons on the shirt. The shirt was "a common, everyday work shirt, gray cotton," bearing the label "Washington Dee and Cee, permanent press shirt." Pearce concluded that the button "could have been torn from the shirt"; that the button could have come from a shirt of that particular type made by the same or a different manufacturer; and that the button "certainly came from a shirt which had other buttons on it which were identical to it."

In our view, the opinion evidence of Pearce is insufficient to warrant a finding that the button found by Cheek came from the shirt found by Cheek on his *second* search of defendant's residence. In addition, we note the following:

The evidence is silent as to when, where and under what circumstances defendant was arrested. When arrested, was defendant wearing the shirt from which a button was missing or had been torn? Was the shirt in defendant's bedroom when Cheek, accompanied by Officer Cockman, first searched defendant's residence at approximately 9:45 a.m. on Sunday, May 20th? The shirt (Exhibit 8) was picked up when Cheek, accompanied by Officer Whitaker, made the *second* search of defendant's residence. Defendant was in custody at all times between the first search and the second search. Neither Cockman nor Whitaker testified.

Although Cheek observed the half of curtain on the ground below Miss Maness's window when he arrived at 9:33 p.m. on Saturday, May 19th, he did not see the button until 3:30 a.m. on Sunday, May 20th. Was the curtain in the custody of an officer during all or any part of this six-hour period? Was it

---

State v. Poole

---

accessible for handling by unauthorized persons during this six-hour period? The evidence is silent as to these matters.

The evidence is silent as to whether Miss Maness used her bedroom curtain or any part thereof when dropping from the bedroom window to the ground some 12 feet below. It is also silent as to when, by whom and under what circumstances the curtain had been hung.

The State suggests, but without support in the evidence, that the intruder (1) left the bedroom by way of the same window used by Miss Maness, and (2) used the curtain to break the force of his descent. Miss Maness estimated that "two minutes" elapsed from the time she locked the bedroom door until she reached the ground. During that period, she did not hear anything which caused her "to think [the lock] was being broken." She testified positively that she did not know how the man whom she saw in the hall got out of the house. Seemingly, it would have been quicker and easier for him to leave by the side door through which he entered.

The State points out that it has offered evidence which contradicts statements attributed to defendant by Cheek. There was uncontradicted evidence that the gas gauge on the truck was broken. However, the State's evidence was sufficient to support a finding that defendant's explanation as to why he had left the truck was false. Too, there was evidence that defendant made a false statement with reference to his ownership of a weapon. However, assuming the statements attributed to defendant were false, the evidence reviewed above is the only evidence which purports to place defendant in the immediate vicinity of the home of Miss Maness at or about the time the crime was committed.

When the evidence most favorable to the State is sufficient only to raise a suspicion or conjecture that the accused was the perpetrator of the crime charged in the indictment, the motion for judgment as in case of nonsuit should be allowed. *State v. Cutler,* 271 N.C. 379, 383, 156 S.E. 2d 679, 682 (1967), and cases cited. Notwithstanding there was evidence which raises a strong suspicion of defendant's guilt, we are constrained to hold that there was no *substantial* evidence that defendant was the person who broke into and entered the home of Miss Maness on the night of 19 May 1973. See *State v. Jones,* 280 N.C. 60, 67, 184 S.E. 2d 862, 866 (1971), and cases cited.

Therefore, defendant's motion for judgment as in case of nonsuit should have been allowed.

. Reversed.

: Justice LAKE dissenting.

It is unquestionably true that upon the defendant's motion for judgment of nonsuit in a criminal action, the evidence of the State, including any which may have been improperly admitted, must be deemed to be true, the State is entitled to all inferences reasonably to be drawn therefrom and any discrepancies or inconsistencies therein are to be resolved in favor of the State. *State v. McNeil,* 280 N.C. 159, 185 S.E. 2d 156; *State v. Vincent,* 278 N.C. 63, 178 S.E. 2d 608; *State v. Primes,* 275 N.C. 61, 165 S.E. 2d 225; *State v. Overman,* 269 N.C. 453, 153 S.E. 2d 44; Strong, N. C. Index 2d, Criminal Law, § 104. "Regardless of whether the evidence is direct, circumstantial, or both, if there is evidence from which a jury *could* find that the offense charged has been committed and that defendant committed it, the motion to nonsuit should be overruled." (Emphasis added.) *State v. Goines,* 273 N.C. 509, 160 S.E. 2d 469.

In passing upon the motion for judgment of nonsuit, the court does not sit as a jury to determine whether the evidence is sufficient to convince the court beyond a reasonable doubt that the defendant is guilty of the offense charged. The function of the court, when such a motion is made, is simply to consider whether there is enough evidence, including all inferences which *may* reasonably be drawn therefrom, to permit a jury to so find. *State v. McNeil, supra.* If there is such evidence, it is for the jury, not the court, to say whether it is convinced beyond a reasonable doubt of the defendant's guilt of the offense charged, or of a lesser offense included therein. Strong, N. C. Index 2d, Criminal Law, § 106. This jury was so convinced.

There is, in this record, ample evidence to support a verdict that someone committed the offense charged in the indictment— burglary in the first degree, the felonious intent accompanying the breaking and entering being the intent to rape the female occupant of the house. The undisputed evidence of the. State is that Miss Maness returned to her home just as it was getting dark and was in bed reading, thus having a light burning in her bedroom. After dark, a Negro man broke and entered the house through a locked, outside door. He carried a firearm.

Miss Maness, observing him in the hallway, slammed the door to her bedroom and locked it and escaped through the window. When she, and those who came to her assistance, reentered the house immediately after the disturbing events were concluded, the locked door to the bedroom had been forced open and splintered. The intruder called to her as she fled from the house, saying, "Stop, I've got a gun." It is not conceivable that the purpose of the breaking and entering, under these circumstances, was other than to rape the occupant of the home.

The remaining question is whether there was enough evidence to permit a jury to find that the defendant was the perpetrator of this offense. The evidence is that the intruder was a "colored man and tall." The defendant is a colored man, six feet two inches in height. A red, panel truck was found by the deputy sheriff, shortly after this break-in occurred, on a rural road less than a quarter of a mile from the Maness residence. The defendant drove it to that point and left it there shortly before the break-in at the Maness residence. There was no residence closer to the truck than the Maness residence. There was no key in the truck. When questioned the following morning about his abandonment of the truck at that point, the defendant told the officer he had run out of gas. Obtaining an ignition key from the owner, the officer promptly started the truck without difficulty. The defendant also told the investigating officer that he had not had a firearm in several years. The evidence is that he purchased a sawed-off rifle one week prior to this occurrence and had it in his possession a few hours before the breaking and entering occurred.

The curtain at the window of the bedroom, through which Miss Maness escaped from the house, was found by the deputy sheriff lying on the ground outside the window when he arrived on the premises shortly after the breaking and entering occurred. Six hours later, the officer, continuing his investigation, found in the fold of this curtain a button. The record indicates that this discovery was made six hours before the defendant was arrested. Miss Maness testified that it did not come from any of her garments. The following day, the residence of the defendant was searched, with his permission, and a shirt, from which a button was missing, was found by the officers. The button found in the fold of the curtain, lying on the ground outside the window of Miss Maness' bedroom, matched exactly the buttons remaining on the shirt so taken from the defendant's

---

residence, not only as to the size, shape, color and texture of the button, but also as to the thread remaining in the holes of the button so found and the thread by which the other buttons were attached to the defendant's shirt.

To say that this evidence is not sufficient to submit to a jury, for its determination, the question of whether this defendant, beyond a reasonable doubt, was the intruder into the Maness home is, in my opinion, completely at variance with the above stated rules governing the determination of a motion for a judgment of nonsuit.

Justices HIGGINS and HUSKINS join in this dissenting opinion.