STATE OF NORTH CAROLINA v. LAWRENCE McCALL

No. 32

(Filed 12 March 1975)

**1. Homicide § 21— death by shooting — sufficiency of evidence**

Evidence was sufficient to be submitted to the jury in a first degree murder prosecution where it tended to show that the victims

State v. McCall

were murdered by a hidden assailant who fired two .12 gauge shotgun rounds, on the day of the crime defendant had several confrontations with decedents, at the time of his arrest defendant had a .12 gauge shotgun in his constructive possession, defendant was present at the time the crimes were committed, defendant hurriedly left the scene of the crime immediately after the two fatal shots had been fired without stopping to help the victims who were in his path, defendant denied owning or possessing a gun but a .12 gauge shotgun was subsequently found hidden in his home, a spent number four .12 gauge shotgun shell found near a trailer (the scene of the crime) was fired from this shotgun, defendant was the only person in the trailer 80 feet from the crime scene when the shots were fired, a shot was fired from a window in the trailer leaving a one-inch hole which was made by a .12 gauge shotgun, and a .12 gauge "shotgun wadding" was found on the ground between the trailer and the victims' bodies.

2. **Constitutional Law § 33— response of defendant to accusatory question — claim of right to remain silent**

Where an officer arrested defendant, advised him of his rights, and then asked him why he killed decedents, the trial court erred in admitting into evidence defendant's response, "You served your warrant, you handcuffed me; that's it," since that response amounted to a claim by defendant of his privilege to remain silent, and the State may not use against defendant at trial the fact that he claimed his privilege in the face of accusation.

3. **Constitutional Law § 33; Criminal Law § 102— failure of defendant to answer accusatory question — comment by prosecutor — failure to give curative instruction**

Defendant is entitled to a new trial where the private prosecutor commented directly on defendant's failure to deny an accusatory question put to him by the arresting officer and called attention to defendant's failure to testify in his own behalf at the trial, and where the court gave no proper curative instruction to the jury.

DIRECT appeal by defendant pursuant to G.S. 7A-27 (a) from his trial before *Martin, J.,* at the 1 February 1974 Regular Criminal Session of TRANSYLVANIA County Superior Court.

Defendant was tried on two bills of indictment that charged him with the first-degree murders of Ruth Looker Hice and Billy Derwood Hice on 12 September 1973. Defendant was also tried on two bills of indictment that alleged defendant "did unlawfully, wilfully and feloniously conspire, agree and confederate with Lloyd McCall and Gary McCall" to murder both Billy Derwood Hice and Ruth Looker Hice "by concealing themselves and shooting [them] with a shotgun."

The above charges, along with identical charges of conspiracy to commit murder against Gary McCall and Lloyd McCall, were consolidated for trial. The court, in its discretion,

severed from the trial two first-degree murder charges against Gary McCall and two first-degree murder charges against Lloyd McCall. All of these charges arose out of the single occurrence described below.

The only evidence was that offered by the State. Summarized, except where quoted, this evidence tended to show the following.

On 12 September 1973 the decedents, Billy Derwood Hice (hereinafter referred to as Billy) and Ruth Looker Hice (hereinafter referred to as Ruth), and the co-defendants as to the conspiracy charge, Lloyd McCall (hereinafter referred to as Lloyd) and Gary McCall (hereinafter referred to as Gary), were all living in trailer-homes adjacent to the north fork of the French Broad River in an area of Transylvania County known as "Balsam Grove." The River separated this property from nearby State Highway #215. The only method of ingress and egress was by means of a "concrete bridge" that crossed the River.

Billy and Ruth had moved into this particular section of the Balsam Grove community sometime in 1969. At that time, access to the property was achieved by means of "a little wooden bridge." Billy, apparently desiring a sturdier structure, erected the "concrete bridge" shortly after his acquisition of the property. In spite of the fact that Billy had built this concrete bridge, the inference from the evidence is that all of his neighboring property owners had continuously used it, without objection, at least up until a point shortly before the incident in question. However, from at least 14 June 1973, up until the date of the incident, 12 September 1973, it appears that a boundary or access dispute had been brewing between Billy and Ruth and Lloyd and Gary.

On the date in question, Mr. Melvin Owens and his wife (hereinafter referred to as either Mr. or Mrs. Owens) were living "straight across" the French Broad River from Billy and Ruth, Lloyd, and Gary. Mr. Owens was the father-in-law of Lloyd, and the grandfather of Lloyd's son, Gary. At this point it should also be noted that defendant and Lloyd were brothers.

Mr. Owens testified as follows regarding the events leading up to the murders of Billy and Ruth.

He first saw defendant at approximately 8:00 a.m. on the day of the murder. At that time, defendant crossed the concrete

---

State v. McCall

---

bridge in his Mustang automobile and stopped at the trailer-home of his brother, Lloyd. Shortly thereafter, defendant and Lloyd left in defendant's Mustang. They crossed the bridge and turned down Highway #215 in the direction of Rosman.

Defendant was next seen at approximately 12:00 p.m. when he and Lloyd returned to Lloyd's trailer-home. Thereafter, defendant drove his car down to Gary's trailer and parked it in the front yard. Several hours later, at approximately 3:00 p.m., Mr. Owens, who was sitting on his front porch, observed defendant "come out from behind Gary's trailer." He was holding a shotgun "up to his shoulder." Defendant fired the shotgun up in the air and the force of the discharge "walked him backwards between two and three steps." Mr. Owens, who had witnessed these events, began laughing "about that gun akicking Lawrence."

While the defendant was firing the shotgun, Billy was down near the bridge area (below Gary's trailer) attempting to erect some type of swinging "gate." After defendant fired the shotgun, Billy motioned for Mr. Owens to come down to where he was working. Upon his arrival, Billy inquired as to who had fired the shotgun, etc.

Following his conversation with Mr. Owens, Billy went back up to his trailer-home in order to get some additional materials for the construction of the gate. He returned in a few minutes and continued his work on the gate. Apparently, "things weren't a' fitting just right," so Billy once again went up to his trailer-home for materials. At this point, defendant entered his car, drove across the bridge, and headed down Highway #215 in the direction of his home (approximately ¼ of a mile). No one other than defendant came across the bridge and went down the highway at this particular time.

Defendant "was gone a right smart little bit." Subsequently, he drove back up Highway #215 and slowly passed by the bridge. A few minutes later he drove back by the bridge. This time he approached from the opposite direction. Defendant repeated this procedure approximately six to eight times. Finally, he pulled off of the highway and onto the bridge. Billy and Ruth were near the bridge, both working on the gate. Defendant stopped his vehicle on the bridge, remained there for a couple of minutes, backed off, and then drove back down the highway.

Shortly after defendant had backed off the bridge, Lloyd left his trailer and got into his pickup truck. He drove the truck down the "upper driveway" and struck the gate as he crossed the bridge. The force of this blow "staggered [Ruth] backwards."

Mr. Owens, having observed all of these events, once again walked over to the bridge area. He told Billy and Ruth that they should stop work on the gate and go back up to their trailer-home. During the course of this conversation, Lloyd returned and drove back across the bridge. He apparently did so without incident. Lloyd proceeded to drive on up the hill and eventually passed by Gary's trailer. Gary, who had been sitting in his back doorway, saw Lloyd go by and started running after the truck. The last time Mr. Owens saw either Lloyd or Gary the pickup truck was going around a curve "and Gary was just about three or four steps behind [it]."

In just a few minutes defendant reappeared. He drove his car onto the bridge near where Billy and Ruth had been working on the gate. Both Billy and Ruth threw up their hands in an effort to stop the defendant's vehicle. Defendant refused to stop. His vehicle "just pushed on into them," eventually knocking Ruth to the ground. Thereafter, defendant drove to the front of Gary's trailer, got out of the car, and ran "in . . . to Gary's front doorsteps."

Following the above incident, Mr. Owens approached Billy and said: "Listen here, Billy, you and Ruth quit this right now and go to the house. From the signs and looks of everything, it's going to pitch a big 'un around here. You get on to the house." Before Billy and Ruth could act on this advice, a gunshot rang out. Ruth, Billy, and Mr. Owens all fell to the ground. This occurred approximately one and one-half minutes after the defendant had forced his way across the bridge. The gunshot came from the left window in the north end of Gary's trailer which was approximately eighty (80) feet away. This was the trailer that the defendant had pulled up to after leaving the bridge.

Following the first shot, Billy was able to get up and to escort Mr. Owens to the edge of his nearby lawn. Thereafter, Billy walked back across the bridge to where Ruth was lying on the ground. At this point a second gunshot rang out. It was not as loud as the first. Mr. Owens, who was almost at his

house, turned and looked toward the bridge (a distance of approximately two hundred feet). He could not see either Billy or Ruth.

Afterwards, Mr. Owens entered his residence and told his wife what had happened. He said: "I've got to get somewheres to get this blood stopped. I'm bleeding to death, and Ruth's dead." Subsequently, he was able to get in his pickup truck and went for help.

After Mr. Owens had gone for assistance, Mrs. Owens went back to the bedroom where she began watching the bridge and adjacent area. She described the subsequent events as follows:

"[W]hile I was sitting there, I seen Lloyd's pickup come and go on up into the yard [presumably at Gary's trailer], and just after it went into the yard, I saw Lawrence's car come out from here, at the trailer, and come and go on down the road.

"Q. Now, did Lawrence's Mustang come right by where Mrs. Hice had fell to the ground?

"A. Yes, sir, it did. It came right by where they was at there.

"Q. Did it stop at any time?

"A. No, sir.

"Q. Did it come between the gateposts there that the Hices had been working on?

"A. He came on out the way he went in.

"Q. Was that between where the gateposts were?

"A. Yes, sir."

Mrs. Owens also testified that she did not hear a second gunshot. As to events occurring immediately prior to the first shot, which she heard, she stated: "I saw Lawrence come up 215 and I didn't see nobody else in the car. Lawrence's car come down in behind Gary's trailer at the front steps. Well, in a minute and a half, I would say, the gun fired." (We note that in a prior statement given to SBI Agent Charles Chambers, Mrs. Owens estimated the time interval at eight minutes.) She also stated that she did not see anybody other than defendant leave Gary's trailer after the shots had been fired.

The first law enforcement officer to arrive at the scene was State Trooper Zeb Hawes. He arrived sometime after 5:00 p.m. When he turned his vehicle into the concrete driveway adjacent to Highway #215, he saw "two bodies lying in the middle of the road." The bodies were approximately twenty (20) feet from the end of the bridge; approximately two hundred (200) feet from the residence of Mr. and Mrs. Owens; approximately four hundred sixty (460) feet from Lloyd's trailer; and approximately eighty (80) feet from the left rear window in the north end of Gary's trailer. These were the bodies of Billy and Ruth Hice. They were both dead. Trooper Hawes did not observe anybody else at the scene at this time.

Dr. George Lacy, District Pathologist, testified that Billy Hice died from multiple gunshot wounds (twenty-one apparent wounds of entrance involving the chest, abdomen, both upper arms, head, and right knee) and specifically of one wound that penetrated the heart. He further testified that Ruth Hice's death was caused by shotgun wounds of the chest with internal bleeding. An examination of her body revealed two entrance wounds, one in the posterior aspect of the chest and one in the right side of the face.

After several additional law enforcement officers had arrived on the scene, they commenced a search of the immediate area. They were not able to find any weapons. However, they did find some "shotgun wadding" on the ground between Gary's trailer and the two bodies. The wadding was found approximately twenty-four (24) feet from Gary's trailer. This wadding was later determined upon analysis to be part of an over-the-shot wadding that compared favorably with the type of wadding manufactured by the Remington Arms Company in .12 gauge shotgun shells. Also, the search uncovered one spent shotgun shell on the ground near the trailer. This was a .12 gauge number four buckshot shell. This was apparently the shell from the shot defendant discharged earlier that afternoon at 3:00 p.m.

In searching the north end of Gary's trailer, officers found a one-inch hole in the left window screen. This hole was later determined to have been made by a shotgun, the muzzle of which was three (3) inches or less from the screen at the time the shot was fired. By looking through this screened window, officers could see the Hices' bodies on the roadway below. During this search, officers also found three (3) .12 gauge Remington shotgun shells in the top dresser of the north bedroom.

State v. McCall

Defendant was subsequently arrested at his home at approximately 2:30 a.m. on the morning of 13 September 1973. He was informed of his constitutional rights. After waiving his rights by nodding his head "Yes" defendant was asked: "Lawrence, where is the gun that you killed Mr. and Mrs. Billy Hice with?" Defendant replied: "I don't have a gun; I don't own a gun." However, a subsequent "consent" search of defendant's residence uncovered a .12 gauge lever action Ithaca shotgun hidden beneath the quilts in the right side bedroom. It was later discovered that this particular shotgun belonged to Keith Hensley, a son-in-law of Lloyd McCall. Although this shotgun was introduced into evidence at defendant's trial, the State was unable to prove that any of the fatal shots were positively fired from this weapon. However, the State did establish that a spent number four .12 gauge shotgun shell found near Gary's trailer was fired by this gun.

There was also testimony as to an alleged "extra-judicial statement" made by defendant during the course of the above residence search. After searching the residence for a few minutes, and prior to the discovery of the .12 gauge shotgun, Officer Hubert Brown asked defendant, "Why did you kill the Hices?" Defendant responded: "You served the warrant, you handcuffed me, that's it."

The jury returned guilty verdicts as to both counts of first-degree murder. However, the jurors were unable to reach a verdict on any of the conspiracy to murder charges. Accordingly, Judge Martin withdrew a juror and declared a mistrial as to these charges. As to the two guilty verdicts of first-degree murder, judgment was entered sentencing defendant to death. Defendent excepted and appealed.

Other pertinent facts and evidentiary matters will be noted in the opinion.

*Attorney General Robert Morgan and Assistant Attorney General Richard N. League for the State.*

*Jack H. Potts and Ransdell & Ransdell by William G. Ransdell, Jr. for defendant appellant.*

COPELAND, Justice.

[1] Defendant assigns as error the denial of his motion for judgment as in case of nonsuit. G.S. 15-173. The question pre-

sented by this assignment is whether the evidence was sufficient to warrant the submission thereof to the jury and to support verdicts of guilty of the criminal offenses charged in the first-degree murder indictments.

The rules for testing the sufficiency of the evidence to withstand defendant's motion are well estalished. "Motion to nonsuit requires the trial judge to consider the evidence in the light most favorable to the State, take it as true, and give the State the benefit of every reasonable inference to be drawn therefrom." *State v. McNeil,* 280 N.C. 159, 161-62, 185 S.E. 2d 156, 157 (1971), and cases cited. See also, 2 Strong, N. C. Index 2d, Criminal Law § 104 (1967). "Regardless of whether the evidence is direct, circumstantial, or both, if there is evidence from which a jury could find that the offense charged has been committed and that defendant committed it, the motion to nonsuit should be overruled. (Citation omitted.)" *State v. Goines,* 273 N.C. 509, 513, 160 S.E. 2d 469, 472 (1968).

"In any prosecution for a homicide the State must prove two things: (1) that the deceased died by virtue of a criminal act; and (2) that the act was committed by the defendant. (Citation omitted.)" *State v. Jones,* 280 N.C. 60, 66, 184 S.E. 2d 862, 866 (1971), and cases cited therein.

All the evidence in the case *sub judice* tends to show that Billy Derwood Hice and Ruth Looker Hice were murdered on the afternoon of 12 September 1973 by a hidden assailant who fired two .12 gauge shotgun rounds. Accordingly, the only remaining question is whether the State produced "substantial evidence" that the above acts were committed by the defendant, Lawrence McCall. *State v. Davis,* 246 N.C. 73, 76, 97 S.E. 2d 444, 446 (1957).

As to this second question, the State's evidence is entirely circumstantial. There was no eyewitness that saw defendant fire the fatal shots. Also, the State could not identify any of the fatal shots as having been fired from the shotgun found in defendant's residence at the time of his arrest. Of course, it was established that the fatal shots were fired from a .12 gauge shotgun. The defendant had a .12 gauge shotgun on the premises of Gary's trailer at approximately 3:00 p.m., 12 September 1973 and defendant had this same .12 gauge shotgun in his possession at the time of his arrest.

State v. McCall

Specifically, the State introduced evidence that tended to show the following:

(1) *Motive.* On the day in question, defendant had several confrontations with the decedents apparently pertaining to access rights across the bridge. During the course of the last confrontation, and immediately prior to the firing of the fatal shots, defendant's vehicle knocked Ruth Hice to the ground as it crossed the bridge.

(2) *Means.* At the time of his arrest, defendant had a .12 gauge lever action Ithaca shotgun in his constructive possession. Defendant fired this weapon on the premises of Gary's trailer on the day in question. Decedents died as a result of wounds inflicted by .12 gauge shotgun pellets.

(3) *Opportunity.* Defendant was present at the time the crimes were committed. In fact, the testimony of both Mr. and Mrs. Owens placed defendant at the doorsteps of Gary McCall's trailer, from inside of which the first shot was fired, approximately one and one-half minutes after defendant had forced his way across the bridge.

(4) *Flight.* Defendant hurriedly left the scene of the crime immediately after the two fatal shots had been fired. Although defendant's vehicle passed by the Hices' bodies, both of which were lying "in the middle" of the roadway, he made no effort to stop or to summon help.

(5) *Prior Inconsistent Statement.* After his arrest, and during a search of his residence, defendant denied that he either owned *or possessed* a gun. The .12 gauge shotgun was subsequently found *hidden beneath the quilts* in one of defendant's bedrooms.

If the State's evidence tended to show only the above stated facts, then it might not be sufficient to withstand defendant's motion. *See State v. Jones, supra* at 66, 184 S.E. 2d at 866 (1971). See also *State v. Poole,* 285 N.C. 108, 119, 203 S.E. 2d 786, 793 (1974). However, in applying these well settled rules to the case *sub judice,* it is necessary to closely examine additional evidence introduced by the State.

In addition to the five facts listed above, the State also produced evidence that tended to show defendant was the ONLY person in Gary McCall's trailer when the shots were fired; that

a shot was fired from the left window in the north end of Gary's trailer; that there was a one-inch hole in the left screen window in the north end of Gary's trailer (said hole later determined to have been made by a .12 gauge shotgun shell discharged three inches or less from the screen) ; that a .12 gauge "shotgun wadding" was found on the ground between Gary's trailer and the Hices' bodies; and that a .12 gauge shotgun number four spent shell, found next to the picnic table in front of Gary's trailer, had been fired from the .12 gauge shotgun found in defendant's constructive possession at the time of his arrest. (This was presumably the spent shell from the 3:00 p.m. firing.)

When all of this evidence is viewed in the light most favorable to the State, including all reasonable inferences that may be drawn therefrom, we hold that it is sufficient to withstand defendants' motion for judgment as in case of nonsuit, and to permit the jury to find him guilty of first degree murder. See, e.g., State v. McNeil, supra; State v. Vincent, 278 N.C. 63, 178 S.E. 2d 608 (1971), and cases cited therein. Defendant's assignment of error is therefore overruled.

[2]  In his next assignment of error defendant contends that the trial court committed prejudicial error in allowing into evidence defendant's invocation of his constitutional right to remain silent in the face of incriminating questions by the police and further in instructing the jury that the evidence was competent as to this defendant.

· As previously noted, defendant was placed under arrest at his residence at approximately 2:30 a.m. on the morning of 13 September 1973. At trial, Deputy Sheriff Hubert Brown was permitted to testify as follows regarding an alleged statement made by the defendant at that time.

"Q. Now, after you had advised Lawrence McCall at his residence on the morning of September 13, 1973, that you had a warrant for his arrest for the killing of Mr. and Mrs. Hice, did you ask him a question at that time?"

"A. Immediately after?

"Q. Yes, sir.

"Q. I asked Mr. Lawrence—

"Mr. Potts: Objection.

. "COURT: Overruled.

"A. —I asked him only one other question during that morning.

"Q. What did you ask him?

"A. I asked him why he killed Mr. and Mrs. Billy Hice.

"Q. What was his reply?

"MR. POTTS: Objection.

"COURT: Overruled.

"A. He said, 'You served your warrant, you handcuffed me; that's it.' And he sat down on the couch at that time.

"COURT: Again, members of the jury, that statement which Officer Brown testified was made by Lawrence McCall to him, is not competent against Gary McCall or Lloyd McCall, *but you may consider it as to Lawrence McCall.*" (Emphasis supplied.)

Prior to permitting Deputy Brown to give the above testimony before the jurors, the trial court conducted a voir dire examination. Following the voir dire, the court made the following conclusions of law.

"On the foregoing findings of fact, the Court concludes as a matter of law that at the time in question the defendant was entitled to the protection of the Fifth Amendment to the Constitution of the United States, and the Constitution of North Carolina, and the requirements as set forth in the decision of MIRANDA v. ARIZONA; that the officers fully complied with said Constitutions and the law with respect to MIRANDA v. ARIZONA, and that the statements made by the defendant as testified to by Brown were made freely and voluntarily, and that they are admissible into the trial of this action, as to the defendant Lawrence McCall. They are not competent as to the defendants Gary McCall and Lloyd McCall."

The correctness of the above conclusion must be tested in light of the following well settled constitutional principles.

In the landmark case of *Miranda v. Arizona,* 384 U.S. 436 (1966), the United States Supreme Court stated: "In ac-

State v. McCall

cord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. *The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation.*" *Id.* at 468 fn. 37. (Emphasis supplied.) Recent decisions by this Court relying upon then Section 11 (now Section 23) of Article I of the North Carolina Constitution and upon *Miranda, supra,* have held that if officers properly warn an accused of his constitutional rights, his silence may not be used against him. *See, e.g., State v. Fuller,* 270 N.C. 710, 155 S.E. 2d 286 (1967); *cf. State v. Moore,* 262 N.C. 431, 437, 137 S.E. 2d 812, 816 (1964).

This Court recently considered the admissibility of in-custody silence in *State v. Castor,* 285 N.C. 286, 204 S.E. 2d 848 (1974). In that case the trial court admitted, over defendant's objection and motion to strike, testimony of a police officer to the effect that defendant failed to deny an accusatory statement made in his presence. In granting the defendant a new trial, this Court, in an opinion by Chief Justice Bobbitt, held that the admission of defendant's silence in the face of the accusation was erroneous, was prejudicial, and was not harmless beyond a reasonable doubt. Specifically, the Court stated:

"The constitutional right against self-incrimination which defendant exercised by remaining silent when Elaine made accusatory statements when questioned by Barrier [the police officer] in defendant's presence is the same constitutional privilege against self-incrimination he exercised at trial when he did not testify after Elaine had testified to substantially the same effect. Adverse comments on a defendant's failure to testify at trial are impermissible under North Carolina law, Constitution of North Carolina, Article I, Section 23, N.C.G.S. § 8-54, and under the Fifth and Fourteenth Amendments to the Constitution of the United States, *Griffin v. California,* 380 U.S. 609, 14 L.Ed. 2d 106, 85 S.Ct. 1229 (1965). *A fortiori,* a defendant's failure to testify may not be considered an admission of the truth of testimony which tends to incriminate him. Similarly, under the circumstances disclosed by the evidence herein, defendant's silence in the rightful exercise of his privilege against self-incrimination may not be considered an admission of the truth of incriminating statements made in defendant's presence by a prospective State's witness in re-

sponse to an officer's questions." *Id.* at 291-92, 204 S.E. 2d at 852-53.

In the instant case, defendant's conduct does not technically fall within the "admission by silence" rule because he voluntarily made an affirmative statement, to wit, "You served your warrant, you handcuffed me; that's it." It cannot be said that this affirmative response, although somewhat equivocal, represented a desire not to communicate any reaction whatsoever to Deputy Brown's incriminatory assertion. However, since such a response could be considered by the jury as evidence of motive for failure to expressly deny the accusation, it is arguable that this situation is equivalent to the simple silence present in *State v. Castor, supra. See* McCormick, Evidence, 353-56, § 161 (2d ed. 1972). Whatever the merits of this argument might be, our decision is not based on this analogy. It is common knowledge that people from different regions have different ways of expressing themselves. Under the facts of this particular case, we believe that the language used by this defendant, although not as articulate or exact as one would desire, nevertheless, can only be construed to mean: "You have advised me of my right to remain silent and that is exactly what I intend to do." Accordingly, since we interpret this response to represent a desire NOT to communicate incriminating information, defendant's claim of privilege made in response to a police accusation during custodial interrogation was not admissible into evidence under authority of *Miranda v. Arizona, supra,* and *State v. Castor, supra.* Furthermore, under these circumstances, we cannot say that the admission of this evidence was harmless beyond a reasonable doubt. *State v. Castor, supra* at 292-93, 204 S.E. 2d at 853, and cases cited.

[3] The above error alone is grounds for the award of a new trial. However, this error is compounded by the following jury argument made by the private prosecutor:

> "If a man was ever called upon in this world to deny something, he was called upon when they said, 'You are charged with murder in the first degree of the Hices.' He didn't say a word. Didn't say a word. He hasn't denied it up to this minute, according to what I've heard from the evidence."

When the above argument was made, defendant objected and the court said simply, "Objection sustained." Other than

the following quoted portion of the court's charge, there is nothing in the record to indicate that the court made any attempt to cure the prejudicial effect of this comment.

> "In this case, the burden of proof is upon the State of North Carolina from the beginning to the end. The defendants, nor either of them, have any burden at all in any of these cases; the defendants, nor either of them, have any duty to produce any evidence, or testimony, or witnesses. They do not have the burden of disproving the charges of the State."

In making the above quoted jury argument, the private prosecutor committed two fundamental errors. (1) He commented directly and clearly upon the defendant's failure to deny Deputy Brown's accusatory question. (2) He called attention to defendant's failure to testify in his own behalf at the trial.

As to the first point, since *State v. Castor, supra,* prohibits the admission of defendant's silence in the face of accusatory statements, and further, since *Miranda v. Arizona, supra,* prohibits the admission of a claim of privilege made in the face of police accusations during custodial interrogation, it logically follows that prosecutorial comment on these matters is likewise prohibited.

As to the second point, G.S. 8-54 provides: "In the trial of all indictments, complaints, or other proceedings against persons charged with the commission of crimes, offenses or misdemeanors, the person so charged is, at his own request, but not otherwise, a competent witness, *and his failure to make such request shall not create any presumption against him."* (Emphasis supplied.) The effect of this statute has been interpreted by this Court to prohibit the solicitor from making any reference to or comment on defendant's failure to testify. *See, e.g., State v. Roberts,* 243 N.C. 619, 621, 91 S.E. 2d 589, 591, (1956); *State v. McLamb,* 235 N.C. 251, 257-58, 69 S.E. 2d 537, 541, (1952); *State v. Buchanan,* 216 N.C. 709, 6 S.E. 2d 521 (1940); *State v. Spivey,* 198 N.C. 655, 658-59, 153 S.E. 255, 257 (1930). See also, *State v. Jones,* 19 N.C. App. 395, 198 S.E. 2d 744 (1973). *Cf. Griffin v. California,* 380 U.S. 609 (1965) (held unconstitutional a State statue allowing comment on defendant's failure to testify). *See also State v. White,* 286 N.C. 395, 211 S.E. 2d 445 (1975); *State v. Hines,* 286 N.C. 377, 211 S.E. 2d 201 (1975).

If the solicitor improperly comments on defendant's failure to testify, this Court has held the error may be cured by a withdrawal of the remark or by a statement from the court that it was improper, followed by an instruction to the jury not to consider the failure of the accused to offer himself as a witness. *State v. Lindsay,* 278 N.C. 293, 295, 179 S.E. 2d 364, 365 (1971) and cases cited; *State v. Clayton,* 272 N.C. 377, 385, 158 S.E. 2d 557, 562-63 (1968). In the instant case, we note that no proper curative instruction was given when the private prosecutor made these impermissible jury arguments. When the argument was objected to, the court simply said, "Objection sustained." The State contends that this error was "cured" by the court's charge to the jury that, "The defendants, nor either of them, have any burden at all in any of these cases; the defendants, nor either of them, have any duty to produce any evidence, or testimony, or witnesses." Under no circumstances can this instruction of the able trial judge be held curative. Additionally, we note the instruction was itself an incomplete statement of the pertinent rule of law. *See State v. Baxter,* 285 N.C. 735, 738-39, 208 S.E. 2d 696, 698-99 (1974) (failed to include statement that failure to testify "shall not create any presumption against" defendant). Under these facts, the court had a duty to give the jury proper instructions. *State v. Miller,* 271 N.C. 646, 659, 157 S.E. 2d 335, 346 (1967); *State v. Smith,* 279 N.C. 163, 166, 181 S.E. 2d 458, 460 (1971) and cases cited therein. Failure to do so constituted prejudicial error and was not harmless beyond a reasonable doubt. *See Anderson v. Nelson,* 390 U.S. 523 (1968); *Fahy v. Connecticut,* 375 U.S. 85 (1963).

Accordingly, for error in admitting the challenged testimony and for failure to properly instruct the jury with reference to the comments made by the private prosecution, the cause is remanded to the Transylvania County Superior Court for a

New trial.