STATE OF NORTH CAROLINA v. TRACIE ANN GREEN LAMBERT

No. 41A94

(Filed 28 July 1995)

## 1. Homicide § 226 (NCI4th)— defendant as perpetrator of murder—sufficiency of evidence

There was substantial evidence from which the jury could conclude that defendant was the one who shot and killed her husband where uncontroverted evidence showed that defendant never left her mobile home from the time she went to bed until the time the police arrived pursuant to her emergency phone call; in the interim her husband was shot in the head while in the mobile home; the victim and defendant owned several pistols, all of which the police found in the mobile home; one of the pistols was the murder weapon; and defendant made an inculpatory statement when she went to the funeral home to view her husband's body, *i.e.*, "Why did you make me do it?".

**Am Jur 2d, Homicide § 435.**

## 2. Homicide § 244 (NCI4th)— premeditation and deliberation—sufficiency of evidence

There was sufficient evidence of premeditation and deliberation to support defendant's conviction for first-degree murder where the evidence that the victim was shot in the back of the head while sleeping showed that the shooting was without provocation, and evidence that defendant knew the location of guns in the house, took one of the guns at night, shot her husband as he slept, replaced the gun, and took measures to leave no fingerprints or removed her fingerprints from the gun showed that defendant thought about killing her husband and carried out her intention in a cool state of blood.

**Am Jur 2d, Homicide § 439.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

**3. Homicide § 393 (NCI4th)— premeditation and delibera-tion—effect of defendant's intoxication**

There was no merit to defendant's contention that evidence of her voluntary intoxication required the trial court to instruct the jury on second-degree murder because her consumption of alcohol and cocaine negated her ability to premeditate and delib-erate where officers testified that defendant was not as emotional as most people were in such situations and that they found cocaine and more than a case of empty beer cans in the bedroom where she was sleeping; there was no direct evidence of recent consumption of alcohol or drugs; evidence tended to show that defendant acted in a rational manner in her conversations with the police from the time she made the emergency phone call; and such evidence, at best, tended to show defendant's mere intoxication.

**Am Jur 2d, Homicide § 448.**

**Modern status of the rules as to voluntary intoxication as defense to criminal charge. 8 ALR3d 1236.**

**Modern status of test of criminal responsibility—state cases. 9 ALR4th 526.**

**4. Evidence and Witnesses § 1259 (NCI4th)— defendant's statement to police—right to silence not invoked**

Admission of testimony by a deputy regarding defendant's statements that she had "blacked out" and could not remember anything and the prosecutor's subsequent cross-examination of defendant about those statements did not violate defendant's Fifth Amendment right to silence, since defendant's statements, though made while she was in custody, were not the result of police interrogation; and defendant's statement that she could not remember anything did not invoke her right to silence but instead could only be construed as her indication that she would willingly have discussed the case had she been able to recall further information.

**Am Jur 2d, Criminal Law § 793; Evidence § 749.**

**5. Evidence and Witnesses § 173 (NCI4th)— victim's state-ments to others about marriage—admissibility to refute defendant's assertions**

In a prosecution of defendant for the murder of her husband, testimony by two witnesses repeating statements about defend-

ant's drug use and problems in his marriage made to them by the victim shortly before his death were admissible under the state-of-mind exception to the hearsay rule and were relevant to rebut defendant's earlier testimony characterizing her marital relationship with the victim as "fine" and "excellent." N.C.G.S. § 8C-1, Rule 803(3).

**Am Jur 2d, Evidence § 667.**

6. **Evidence and Witnesses § 1113 (NCI4th)— inculpatory statement—admission of party opponent—admissibility**

In a prosecution of defendant for the murder of her husband, the trial court did not err in admitting defendant's statement, "Honey, why did you make me do it?" while she was viewing her husband's body at the funeral home, since the statement was too ambiguous to be incriminating and was an admission by a party opponent within the purview of N.C.G.S. § 8C-1, Rule 801(d)(A); the statement was obviously relevant; and the admission, though prejudicial to defendant, was not unfairly so.

**Am Jur 2d, Evidence § 760; Homicide § 337.**

7. **Evidence and Witnesses § 2089 (NCI4th)— defendant's demeanor at crime scene—admissibility of investigating officers' testimony**

In a prosecution of defendant for the murder of her husband, the trial court did not err in allowing the testimony of the investigating officers which related to defendant's lack of emotion at the scene of the killing, since the testimony stemmed from the officers' personal experience combined with their observation of defendant, was helpful to a clear understanding of a relevant issue, and had probative value which was not outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rule 701.

**Am Jur 2d, Expert and Opinion Evidence §§ 359, 364.**

8. **Criminal Law § 750 (NCI4th)— reasonable doubt—instruction proper**

The trial court's instruction on reasonable doubt was proper in this first-degree murder case.

**Am Jur 2d, Trial §§ 1291, 1371.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Greeson, J., on

STATE v. LAMBERT

[341 N.C. 36 (1995)]

11 March 1993 in Superior Court, Cabarrus County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court on 16 March 1995.

Michael F. Easley, Attorney General, by Jeffrey P. Gray, Assistant Attorney General, for the State.

Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for the defendant-appellant.

MITCHELL, Chief Justice.

Evidence for the State tended to show that on 25 November 1991 at 12:20 a.m., the Cabarrus County Sheriff's Department received an emergency phone call from defendant. The defendant, Tracie Ann Green Lambert, told the dispatcher that she was in bed asleep with her son in a back bedroom of her mobile home and had been awakened by a gunshot from the front of her home. She told the dispatcher that her husband was in the front part of the home. The dispatcher told her to stay in the back bedroom until police arrived and asked if anyone else was in the mobile home or if she had heard any other noises. She responded that her husband was alone as far as she knew and that the only other noise she had heard was the sound of the front door closing. Subsequently, the police arrived at the mobile home, and the dispatcher directed defendant to put the phone down and open the front door.

Deputy Lieutenant Tony McGuire arrived at the mobile home with three other deputies at approximately 12:30 a.m. He and Deputy Furr knocked on the front door while Deputies Clark and Mason went around to check the back door. Defendant opened the front door, and McGuire entered. McGuire asked defendant to turn on some lights and to show him where the noise originated. Defendant indicated that the noise had come from the front bedroom. Upon entering, McGuire saw the victim, Terry Lambert, lying on the left side of the bed, with his left arm outstretched. The victim had suffered a gunshot wound to the right rear side of his head. He was barely breathing and unresponsive when McGuire found him. The bedroom appeared to have been ransacked. Defendant asked about her husband's condition and McGuire informed her. Deputy Mason testified that defendant did not show a lot of emotion during this time. Deputy McGuire stated that she was "lackadaisical, distant [and] nervous," and appeared to be

under the influence of an impairing substance. The victim died a few hours later.

Deputy Steve Cook arrived at the scene at approximately 12:55 a.m. Prior to Cook's arrival, defendant told the deputies that there were three guns in the house. Upon entering the house, Cook looked at a shelf on the entertainment center where one of the guns was located. He found the gun in a holster on the shelf and saw tracks in the dust which indicated that the gun had been moved recently. His examination also revealed that the gun was a loaded, cocked, .38-caliber pistol with its safety off. Cook also found a $100.00 bill lying on top of the entertainment center, a shirt and a pair of men's pants next to the entertainment center, and the victim's wallet containing over $100.00 in currency in the pants.

Approximately one-half hour after Deputy Cook's arrival, Deputy Beaver arrived to aid Cook and videotape the crime scene. At some point during the period when Cook and Beaver were processing the crime scene, defendant was taken by another deputy to the Sheriff's Department. While videotaping, Deputy Beaver found a shell casing on the victim's bed and a bullet in the pillow where the victim's head had been resting. Subsequently, Beaver and Cook went to the back bedroom where defendant was allegedly sleeping when the gun went off and found what turned out to be a bag of cocaine under the mattress and more than two dozen beer cans under the bed. Further investigation indicated that the home had not been entered forcibly. Additionally, an examination of the back door and the .38-caliber pistol failed to reveal latent fingerprints.

Tests at the State Bureau of Investigation revealed that the bullet and the shell casing found by Deputy Beaver were fired from the .38-caliber pistol found on the dusty shelf of the entertainment center. The lab also reported that the gunshot residue test performed on defendant was negative. However, testimony by deputies revealed that after defendant was informed that she was being taken to the Sheriff's Department, she cried and wiped her face with her hands frequently. Deputy Beaver testified that the negative gunshot residue test could be explained by defendant's wringing of her hands and the use of her hands to wipe tears from her face.

On 27 November 1991, defendant was allowed to go to a local funeral home to view her husband. She was accompanied by a sheriff's deputy and a jail matron. Both testified that defendant was "pretty hysterical and crying." They also testified that while she stood

over the victim's body, she stated twice: "Honey, why did you make me do it?"

Defendant also introduced evidence at trial. Josh, defendant's four-year-old son and the victim's stepson, initially told police that at the time of the killing, he got out of bed upon hearing a shot. He walked down the hall to the bedroom where his stepfather was located and saw another man standing in that bedroom. At trial, Josh admitted that did not happen. He also admitted that he did not know the sound was a gunshot until his maternal grandparents told him. The remainder of his trial testimony corroborated his mother's story.

Defendant testified that she loved the victim, that they had an excellent marriage, and that she did not kill him. She recounted that on the night of the murder, she had fallen asleep watching television in the back bedroom. Consistent with her emergency call to police, she testified that she was awakened by the sound of a gunshot and that she heard a door close a few seconds later. She immediately called the police and waited for their arrival. Eventually, she was taken to the Sheriff's Department for a gunshot residue test. She testified that after the deputies completed the test, they released her at about 4:30 a.m., and she went to her parents' home. At approximately 7:00 p.m. that same day, the police came to her parents' home and arrested her. She stated that she had never admitted killing her husband while she stood over his coffin at the funeral home and, that while there, she actually said that she did not kill him. Defendant also testified in detail about several incidents prior to the murder which she said had occurred at the mobile home. On two separate occasions, windows had been shot out of the mobile home or the victim's truck. On one of those occasions, a pistol was stolen out of defendant's truck but was later found on their property. Each of those incidents was reported to the police.

During the State's rebuttal evidence, it introduced testimony from two of the victim's friends. Each of them testified that a few days before the murder, the victim told them that he was leaving his wife because of her alcohol and cocaine abuse. The State also introduced testimony of a day care worker who testified that defendant had alcohol on her breath on several occasions when she dropped her son off for day care in 1991.

[1] By an assignment of error, defendant argues that the trial court erred in denying her motion to dismiss for insufficiency of the State's evidence to sustain her conviction for murder. To convict a defendant

of murder, the State "must offer evidence from which it can be reasonably inferred that the deceased died by virtue of a criminal act and that the act was committed by the defendant." *State v. Furr*, 292 N.C. 711, 718, 235 S.E.2d 193, 198, *cert. denied*, 434 U.S. 924, 54 L. Ed. 2d 281 (1977). It is undisputed that the victim in this case died by virtue of a criminal act. The issue defendant presents by this assignment of error is whether there was substantial evidence tending to show that the criminal act was committed by defendant.

The law will not allow a conviction on evidence that merely gives rise to suspicion or conjecture that the defendant committed the crime. *State v. Jones*, 280 N.C. 60, 184 S.E.2d 862 (1971); *see also State v. Furr*, 292 N.C. 711, 235 S.E.2d 193. However, a motion to dismiss must be denied if there is substantial evidence—direct, circumstantial, or both—that the defendant committed the crime. *State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 208-09 (1978). " 'Substantial evidence' is that amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Cox*, 303 N.C. 75, 87, 277 S.E.2d 376, 384 (1981). When considering a motion to dismiss, the evidence presented must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Easterling*, 300 N.C. 594, 604, 268 S.E.2d 800, 806-07 (1980). We conclude that when considering the evidence in the light most favorable to the State in the present case, there was substantial evidence from which the jury could conclude that defendant was the one who shot and killed her husband.

Defendant cites *Jones* and *Furr* as controlling on this issue. We find those cases easily distinguishable from the present case. In both of those cases, evidence of opportunity of the defendants to commit the crime was tenuous, if not altogether absent. Here, on the other hand, defendant's opportunity was conclusively established. Uncontroverted evidence showed that she never left the mobile home from the time she went to bed until the time the police arrived pursuant to her emergency phone call. In the interim, her husband was shot in the head. The victim and defendant owned several pistols, and the police found each of them in the home; one of those pistols was the murder weapon.

In addition to showing that defendant had the opportunity to commit the crime, the evidence also tended to show that she made an inculpatory statement when she went to the funeral home to view her

husband's body. At the funeral home, she went to her husband's open casket, began touching his face, and stated twice: "Honey, why did you make me do it?" Defendant, relying upon the authority of *Furr*, contends that the statement is not inculpatory. In *Furr*, the defendant said, "Well, you all know who did it and I know who did it, but nobody else will ever know but me." *Furr*, 292 N.C. at 718, 235 S.E.2d at 198. This Court concluded that the statement was not inculpatory because, while "defendant's remarks after the crime tend to show . . . that he knew who killed his wife, [they do not show] that he did so himself." *Id.* at 719, 235 S.E.2d at 198. In the present case, unlike *Furr*, defendant's statement made reference to herself—"why did you make *me* do it?" (Emphasis added.) Further, defendant's statement took place as she stood over the body of her dead husband, whom she was accused of murdering. In that context, a reasonable juror could infer that when she said "it," she was referring to the murder. The opportunity defendant had to commit the crime and the inculpatory statement she made at the funeral home carry the State's case beyond the realm of mere conjecture or speculation. Such evidence was substantial evidence adequate to support the conclusion by a reasonable mind that defendant committed the crime of murder. Therefore, this assignment of error is overruled.

**[2]** By another assignment of error, defendant argues that, even if there was sufficient evidence that she committed the crime, there was insufficient evidence of premeditation and deliberation to support her conviction for first-degree murder. "Premeditation is defined as thought beforehand for some length of time; deliberation means an intention to kill, executed by defendant in a 'cool state of blood' in furtherance of a fixed design or to accomplish some unlawful purpose." *State v. Jones*, 303 N.C. 500, 505, 279 S.E.2d 835, 838 (1981). Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. They usually must be proved by circumstantial evidence. *State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992). Among the numerous circumstances which may be considered as tending to show premeditation and deliberation, two are particularly relevant in this case: (1) absence of provocation on the part of the victim, and (2) the defendant's conduct and statements before and after the killing. *See id.*

As we have already explained, the jury could have reasonably concluded that defendant killed her husband. Further, there was substantial evidence from which it also could have concluded that she killed him after premeditation and deliberation. The evidence tended

to show that defendant was alone in the mobile home with her son and husband when the shooting occurred. The victim was shot in the back of the head. He was found on a bed, lying on his side. The lethal bullet was discovered in the pillow where his head rested. It could reasonably be inferred that defendant shot her husband while he was sleeping and, thus, that the shooting was without provocation.

Defendant's conduct before and after the shooting also supports the inference that she shot her husband after premeditation and deliberation. She indicated to the police that she knew the location of each of the guns in the home. The murder weapon was found, loaded, with the safety off, in its unsnapped holster on a shelf in the living room. Tracks in the dust on the shelf indicated that the gun had been recently moved. From such evidence, the jury could infer that defendant had gone into the darkened living room and picked up the gun. She then walked to her husband's bedroom and shot him as he slept. After the shooting, she had to return to the same location and replace the gun. Further, no latent fingerprints were found on the gun. From that fact, the jury could infer that defendant either took steps to prevent leaving her fingerprints on the gun or that she took steps to remove them after the killing. The foregoing evidence was sufficient to permit the jury to find that defendant thought about killing her husband before she did so and that she carried out her intention in a cool state of blood. Therefore, there was substantial evidence from which the jury could reasonably conclude that defendant committed this murder after premeditation and deliberation. This assignment of error is without merit.

By another assignment of error, defendant sets forth three bases for her contention that the trial court erred by failing to instruct the jury on second-degree murder. The trial court instructed the jury only as to possible verdicts finding defendant guilty or not guilty of first-degree murder.

[3] First, defendant contends that the evidence of her voluntary intoxication required the trial court to instruct the jury on second-degree murder because her consumption of alcohol and cocaine negated her ability to premeditate and deliberate.

> A defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on evidence produced by the state, of his intoxication. Evidence of

> mere intoxication, however, is not enough to meet defendant's burden of production. He must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill.

*State v. Mash*, 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988). Defendant cites testimony by officers who investigated the crime. In summary, they testified that she was "under the influence of an impairing substance," she was "lackadaisical" and "distant," she was not as emotional as most people were in such situations, and they found cocaine and more than a case of empty beer cans in the back bedroom. There was no direct evidence of recent consumption of alcohol or drugs. Defendant may have been "distant," but the evidence tended to show that she acted in a rational manner in her conversations with the police from the time she made the emergency phone call. Even when viewed in the light most favorable to defendant, the officers' testimony was, at best, evidence of mere intoxication. It did not tend to "show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render [her] utterly incapable of forming a deliberate and premeditated purpose to kill." *Id.* Therefore, the trial court was not required to instruct the jury regarding voluntary intoxication, and this basis for the assignment of error must fail.

Defendant's second basis for assigning error to the trial court's failure to give a second-degree murder instruction relies on the absence of several of the indicia of premeditation and deliberation frequently mentioned by this Court. Specifically, she contends there was no evidence of prior threats or assaults, lethal blows after the victim fell, or a brutal or gross-force killing. Defendant attempts to use the absence of such evidence to bolster her argument that the jury could have inferred that she was too intoxicated to premeditate and deliberate. Her argument assumes either that she would have done such things if she had been sober or that she did not do such things because she was intoxicated. This contention is without foundation.

Third, notwithstanding the circumstantial evidence tending to show premeditation and deliberation, defendant characterizes the State's evidence of premeditation and deliberation as speculative. Essentially, she contends that because the evidence of premeditation and deliberation was not clear and convincing, the jury should have

been allowed to reflect that fact by reducing its verdict to second-degree murder. Such considerations do not provide a proper basis for submitting second-degree murder for consideration by the jury.

Murder in the second degree is defined as the unlawful killing of another with malice, but without premeditation and deliberation. *State v. Fleming*, 296 N.C. 559, 562, 251 S.E.2d 430, 432 (1979). This Court reiterated the test for determining whether a second-degree murder instruction is required in *State v. Arrington*, 336 N.C. 592, 444 S.E.2d 418 (1994), when it said:

> The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*Id.* at 594, 444 S.E.2d at 419 (emphasis in original). In the present case, there was substantial evidence to prove each element of first-degree murder. Further, because the evidence was insufficient to require an instruction on voluntary intoxication, there was no evidence which negated the elements of first-degree murder other than defendant's denial that she committed the crime. If the jury believed that defendant committed this crime, the reasonable inferences from the evidence adduced pointed only to a killing with premeditation and deliberation—she retrieved the gun, shot her sleeping husband, returned the gun, and called the police with a contrived story. Therefore, because second-degree murder exists only in the absence of premeditation and deliberation, such an instruction was not warranted under the law or facts of this case. *Id.* This assignment of error is overruled.

[4] Defendant's next assignment of error concerns the admission of evidence about statements she made to Deputy Cook after her arrest. She contends that the admission of testimony by Deputy Cook regarding those statements and the prosecutor's subsequent cross-examination of her about those statements violated her right to silence under the Fifth Amendment to the Constitution of the United States and Article I, Section 23 of the Constitution of North Carolina.

Deputy Cook testified that on the day after defendant's arrest, one of the jail matrons called him and said that defendant had asked to speak with him. When Cook went to the jail, he was informed that defendant wished to talk to her father before speaking with Cook. Defendant spoke with her father for about fifteen minutes. When she finished her discussion with her father, she approached the officers and told them that she "blacked out" and could not remember anything. Defendant contends that her statement amounted to an assertion and exercise of her right to silence and that the trial court erred in permitting Deputy Cook to testify concerning that exercise of her right.

In *State v. Morston*, 336 N.C. 381, 445 S.E.2d 1 (1994), this Court said:

> "[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation." Therefore, the prosecution in a criminal trial may not "use . . . the fact that [the defendant] stood mute or claimed his privilege in the face of accusation."

*Id.* at 395-96, 445 S.E.2d at 9 (quoting *Miranda v. Arizona*, 384 U.S. 436, 468 n.37, 16 L. Ed. 2d 694, 720 n.37 (1966)) (citations omitted). Under *Miranda*, a conclusion that a defendant's right to remain silent has been violated necessarily encompasses findings that, among other things, the defendant was subject to interrogation and that she effectively invoked her right to silence. As neither of those factors are present in the instant case, defendant's argument as to Deputy Cook's testimony must fail.

First, while her statements were made when she was in custody, they were not the result of police interrogation. She initiated the contact by asking to see Deputy Cook but met with her father before speaking to Cook. When she emerged from the meeting with her father, she told police that she had "blacked out." At no time during this sequence of events did the police ask her a single question; she volunteered the fact that she could not remember anything. "In order to trigger the exclusionary rule of *Miranda*, it is necessary that the statement be the result of interrogation." *State v. Edgerton*, 328 N.C. 319, 321, 401 S.E.2d 351, 352 (1991).

Second, defendant's statement did not invoke her right to silence. In *State v. McCall*, 286 N.C. 472, 212 S.E.2d 132 (1975), the defendant responded to the questioning of an officer by saying, "You served your

warrant, you handcuffed me; that's it." *Id.* at 485, 212 S.E.2d at 140. This Court held that the defendant's response was inadmissible because it reflected his desire not to communicate with the officers and could only be construed as an invocation of his right to silence. *Id.* In the instant case, however, the fact that defendant asked for Cook in order to discuss the case with him and then told him that she could not remember anything could only be construed as her indication that she would have willingly discussed the case had she been able to recall further information. Thus, the implication here is just the opposite of the implication in *McCall*; this defendant's actions and statements indicated a desire *not to remain silent*.

Defendant also contends in support of this assignment of error that the trial court erred by allowing the State to cross-examine her about her statement. She argues that the cross-examination amounted to improper impeachment of her trial testimony with evidence of her exercise of the right to remain silent. The premise for defendant's argument is that the statement effectively invoked her right to remain silent. As we have already discussed, defendant's statement did not invoke her right to remain silent. Therefore, this argument and this assignment of error fail.

**[5]** By another assignment of error, defendant argues that testimony by two witnesses repeating statements made to them by the victim shortly before his death were inadmissible and irrelevant hearsay. The State responds that the testimony was offered to rebut defendant's earlier testimony characterizing her marital relationship with the victim as "fine" and "excellent."

During the State's rebuttal evidence, Terry Troutman and Jeff Turner both testified as to statements made by the victim to each of them less than two days before the murder. The prosecutor asked Turner: "[D]id [the victim] talk to you during that time about his marital relationship or any problems with his wife?" Turner replied that the victim had said: "[H]e caught the defendant on cocaine again, and he was leaving, and moving out." Troutman was asked: "[D]id he discuss any marital problems that he was having with you?" Troutman responded: "[H]e thought they was [sic] getting along all right; but, you know, he said he just wasn't getting along like it should" and "he said she was still drinking; and he believed she was still on cocaine. He didn't know for sure then."

Rule 803(3) of the North Carolina Rules of Evidence provides that "[a] statement of the declarant's then existing state of mind" is not

excluded by the hearsay rule. N.C.G.S. § 8C-1, Rule 803(3) (1992). The victim's statements to Troutman and Turner that his marriage "wasn't getting along like it should" and that he was leaving were statements indicating his mental condition at the time they were made. Thus, the statements meet the requirements of Rule 803(3).

The fact that evidence meets the requirements for showing state of mind does not, alone, make the evidence admissible. Defendant correctly points out that the evidence must be relevant as well. This hearsay evidence was relevant and admissible during the State's rebuttal case to contradict a favorable inference for defendant raised by her own testimony. "Evidence tending to show the victim's state of mind is admissible so long as the victim's state of mind is relevant to the case at hand. . . . 'Any evidence offered to shed light upon the crime charged should be admitted by the trial court.' " *State v. Stager*, 329 N.C. 278, 314, 406 S.E.2d 876, 897 (1991) (quoting *State v. Meekins*, 326 N.C. 689, 695-96, 392 S.E.2d 346, 349 (1990)) (citation omitted). During defendant's testimony, she told the jury that her marital relationship was "fine" and "excellent." By that testimony, she implicitly indicated that she had no reason to kill the victim. Testimony about the positive state of the marital relationship opened the door to rebuttal evidence showing that defendant thought that the relationship was not "fine" or "excellent". "Discrediting a witness by proving, through other evidence, that the facts were otherwise than [s]he testified, is an obvious and customary process that needs little comment. If the challenged fact is material, the contradicting evidence is just as much substantive evidence as the testimony under attack, and no special rules are required." 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 160 (4th ed. 1993). The evidence of the victim's statement was admissible as an exception to the hearsay rule since it was relevant to refute the assertion by defendant and others who testified on her behalf that the marital relationship was fine. *See Stager*, 329 N.C. at 314-15, 406 S.E.2d at 897 (victim's statement was admissible because it tended to disprove defendant's contention that there was a normal, loving marital relationship). Therefore, this assignment of error is overruled.

**[6]** By another assignment of error, defendant challenges the admissibility of her statement, "Honey, why did you make me do it?" First, she contends that the statement was not admissible as an admission of a party-opponent under Rule 801. "A statement is admissible as an exception to the hearsay rule if it is offered against a party and it is . . . his own statement . . . ." N.C.G.S. § 8C-1, Rule 801(d)(A) (1992).

"An admission is a statement of pertinent facts which, in light of other evidence, is incriminating." *State v. Trexler*, 316 N.C. 528, 531, 342 S.E.2d 878, 879-80 (1986). Defendant essentially reiterates here the same arguments she raised earlier in this case contending that this statement was too ambiguous to be incriminating. We reject these arguments for·the same reasons previously given and therefore find that the statement is an "admission" which falls squarely within this rule. Second, defendant contends the statement is irrelevant. As an incriminating statement, it obviously has a tendency to prove a fact of consequence in the case and is, thus, relevant. *See* N.C.G.S. § 8C-1, Rule 401 (1992). Third, she contends that the statement is unfairly prejudicial. As an admission of guilt, this evidence is highly probative; the fact that it is also very prejudicial does not make it unfairly so. *See* N.C.G.S. § 8C-1, Rule 403 (1992). For these reasons, this assignment of error is overruled.

[7] Defendant also assigns error to the portion of Deputy McGuire's and Deputy Mason's testimony which related to her demeanor at the scene of the killing. She contends that this evidence violated Rules 401, 402, and 701 of the North Carolina Rules of Evidence.

The State first established the presence of both deputies at the mobile home shortly after the victim had been shot and the fact that they both were able to observe defendant. Deputy Mason then testified as follows:

[Prosecutor:] Describe how she appeared to you.

[Mason:] She didn't show a lot of emotions considering the nature of why we were there.

   . . . .

[Prosecutor:] Now, based on that and the time you were with her, her knowing that her husband had just been shot in the head, was there anything about her actions that seemed out of the ordinary or inappropriate to you?

[Mason:] Other than her lack of emotion, which I stated earlier, I don't recall anything.

During Deputy McGuire's testimony, he stated that he had been on "dozens" of homicide calls. He subsequently testified as follows:

[Prosecutor:] Lieutenant, how would you compare the way [defendant] reacted to the particular situation that you all found

yourself in compared with the numerous other calls of this nature you've been on where loved ones were involved?

[McGuire:] Even though she was nervous, she wasn't near as hysterical, and she wasn't near as tearful and concerned, in my opinion, as most people are in these situations.

. . . .

[Prosecutor:] How would you describe people, normally, in these situations? Just an overall state of mind of people when they're confronted with these situations.

[McGuire:] Females are generally different than males. They're generally hysterical. They're tending to try to get to the victim. They're just generally in a state of almost shock, the ones that I've observed.

[Prosecutor:] Did you observe these characteristics with [defendant]?

[McGuire:] No, Sir.

Rule 701 controls the introduction of opinion testimony by lay witnesses as follows:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally related to the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (1992). Such "[o]pinion evidence as to the demeanor of a criminal defendant is admissible into evidence." *State v. Stager*, 329 N.C. at 321, 406 S.E.2d at 900. The foregoing opinion testimony of both witnesses related to their perceptions of defendant during the time shortly after the shooting. This testimony stemmed from their personal experience combined with their observation of defendant and was helpful to a clear understanding of a relevant issue—defendant's demeanor shortly after the crime—thus, it was admissible under Rule 701 and relevant under Rule 401. Further, the trial court did not abuse its discretion by holding that the probative value of the evidence was not outweighed by the danger of unfair prejudice. *See* N.C.G.S. § 8C-1, Rule 403. Therefore, we overrule this assignment of error.

**STATE v. LAMBERT**

[341 N.C. 36 (1995)]

**[8]**  In another assignment of error, defendant contends that the trial court's instruction on reasonable doubt was erroneous as a matter of law. The trial court instructed the jury, *inter alia*:

> Now a reasonable doubt, members of the jury, means exactly what it says. It is not a mere possible, or an academic, or a forced doubt, because there are few things in human experience which are beyond a shadow of a doubt or which are beyond all doubt; nor is it a doubt suggested by the ingenuity of counsel, or even by the ingenuity of your own mind not legitimately warranted by the evidence and the testimony here in this case.

> Of course, your reason and your common sense would tell you that a doubt would not be reasonable if it was founded by, or suggested by, any of these types of considerations.

> A reasonable doubt is a doubt based on reason and common sense, arising out of some or all of the evidence that has been presented, or the lack of or insufficiency of that evidence as the case may be. Proof beyond a reasonable doubt is such proof that fully satisfies, or entirely convinces you of the defendant's guilt.

In *State v. Conner*, 335 N.C. 618, 636-38, 440 S.E.2d 826, 836-38 (1994), this Court approved a reasonable doubt instruction essentially identical to the one given in the instant case. For the reasons set forth in *Conner*, we overrule this assignment of error.

For the foregoing reasons, we conclude that the defendant received a fair trial, free of prejudicial error.

NO ERROR.

Justice ORR did not participate in the consideration or decision of this case.